WILLIAMS PIPE LINE CO., a
Delaware corporation,
Plaintiff,

v.

CITY OF MOUNDS VIEW, MINNESOTA,
an incorporated municipality, Jerome
W. Linke, its Mayor, Donald F. Pauley,
its Clerk-Administrator, Barbara A.
Haake, Susan Hankner, Phyllis I.
Blanchard, and Gary C. Quick, members of the Mounds View City Council,
Defendants.

COUNTY OF RAMSEY, Plaintiff,

v.

WILLIAMS PIPE LINE
COMPANY, Defendant.

CITY OF MOUNDS VIEW, Plaintiff,

v.

WILLIAMS PIPE LINE
COMPANY, Defendant.

Civ. Nos. 4–86–648, 4–86–651
and 4–86–656.

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 7, 1987.

William E. Flynn, and Lawrence E. Meuwissen, O'Connor & Hannan, Minneapolis, Minn., and Mark K. Blongewicz, Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, Tulsa, Okl., for Williams Pipe Line.

Michele L. Timmons, Chief, Civ. Div., Ramsey County Attorney's Office, St. Paul, Minn., Ramsey County.

Richard Meyers, and Eric W. Valen, St. Paul, Minn., for City of Mounds View.

Alan R. Mitchell, Sp. Asst. Atty. Gen., St. Paul, Minn., for amicus curiae State of Minn.

DIANA E. MURPHY, District Judge.

On July 8, 1986, a portion of a petroleum pipeline owned by Williams Pipe Line Company (Williams) failed. A resulting explosion and fire killed two people and badly injured a third. The accident also caused property and environmental damage. These related law suits are only part of ongoing proceedings relating to the accident and operation of the pipeline.

By order dated August 22, 1986, 651 F.Supp. 544, this court denied motions of the County of Ramsey and the City of Mounds View for orders restraining Williams from testing or restarting the pipeline.[1] The court granted Williams a limited temporary restraining order barring

---

1. The court also denied motions of Ramsey County and Mounds View to remand the actions they had initiated to state court. See Memorandum Opinion and Order of August 22, 1986, 651 F.Supp. 544, 547–548. The memorandum reviewed the background and parties' claims as of that date.

the other parties from interfering with preparation for testing the pipeline. Subsequently, the parties reached agreements permitting Williams to test the pipeline. *See* Stipulations and Orders of September 16 and 17, 1986. The matter is now before the court on motions by all parties for preliminary injunctions. Williams asks that the court enjoin the other parties from interfering with the reopening and operation of the line.[2] Ramsey County and Mounds View seek to enjoin operation of the pipeline. The county's proposed injunction would bar resumption of operations without its permission. Mounds View's proposed injunction would prevent reopening of the pipeline during the pendency of this litigation.

*Background*

These preliminary findings of fact are drawn from a number of sources. There have been two evidentiary hearings in this court. The parties have also submitted substantial other materials, including affidavits, scientific papers, photographs, volumes of testimony taken in other settings, graphs, charts, press releases, and numerous letters. Many of the material facts are uncontested, but others are vigorously disputed. The parties' positions are unfortunately not always clear.

A. *History of the Pipeline*

Williams operates hazardous liquid pipelines in 12 states. It acquired Line 2N from the Great Lakes Pipeline Company in 1966. This line runs from the Roseville Terminal, in or near Minneapolis, Minnesota to Duluth, Minnesota and Superior, Wisconsin. In 1957, prior to Williams' acquisition of the line, Ramsey County and several private land owners had granted permission to the predecessor company to construct approximately ten miles of the

pipeline through their property.[3] The county resolution granting permission to lay two and one-half to three miles of pipe through a county right-of-way along Long Lake Road contained certain conditions: the company was to "remove, reinstall, or repair such pipe when in the opinion of the County Engineer or the Board of County Commissioners such removal, installation or replacement shall be advantageous to the people of this County." The company was also to give notice of any intended excavation, maintenance or removal and to perform such work under the supervision of the county engineer. The county engineer had the right to "make all rules with respect to possible hazards as he shall deem necessary and advisable."

The pipe comprising Line 2N is electric resistance weld (ERW) pipeline manufactured by Jones and Laughlin Co. in the late 1950's. Such ERW pipeline was made from flat steel. The steel was formed into pipe and then welded at a seam, first by use of an electric current and then by use of heat. These seam welds make ERW pipe different from other line pipe materials manufactured in past decades.[4] See J. Kiefner, Evaluating Pipeline Integrity-Flaw Behavior During and Following High Pressure Testing (1986). While most pipes are "tough, ductile materials," *id.*, the weld zones of some ERW materials are not. As a result, failure in ERW pipes differs from that in most pipes. While extension of a defect "may take the form of slow stretching and tearing if the material is relatively tough and ductile, ... it may take the form of sudden short burst of cracking if the material is not particularly tough and ductile, possibly leading to complete failure." *Id.* Some have questioned the integrity of these pipes. Federal law does not forbid their use.

---

2. Williams also filed a motion for summary judgment too close to the injunction hearing to permit a response as required by the local rules. The current record indicates that the motion was also premature.

3. Williams also acquired from Great Lakes another line which runs through Ramsey County.

This line, which extends from the Roseville Terminal to Newport Villas, Minnesota, was laid before line 2N.

4. Older ERW pipe is also different from, and apparently inferior to, ERW pipe currently manufactured.

The record contains little evidence of Williams past leak and safety record in Minnesota. The company has publicly stated that it has experienced 55 pipeline leaks and 34 station or terminal leaks in its Minnesota pipeline during the last 10 years. Of the pipeline leaks, 24 involved coated pipeline, such as those at issue here. These leaks apparently had a variety of causes, some wholly outside Williams' control. Two previous failures—one on Line 2N and one on the Newport Villas line, involved weld seam splits in ERW pipe. In both cases, Williams concluded that the failures resulted from manufacturing defects. There is no evidence in the record to suggest that any of the leaks prior to July 1986 caused serious injury or loss of life.

Williams tested Line 2N in 1984. Seventeen sections of the pipeline failed, most of them as a result of seam failures. Only a limited investigation of those failures was made. After replacing the failed sections, Williams successfully hydrostatically tested the line at approximately 1900 p.s.i.g.[5]

### B. Federal Regulation

Interstate hazardous liquid pipeline safety is regulated by the United States Department of Transportation (DOT). Under the Hazardous Liquid Pipeline Safety Act of 1979 (HLPSA), 49 U.S.C. §§ 2001–2014 which was enacted in 1979, the Secretary of DOT (the Secretary) must establish and enforce safety regulations for construction of new pipelines and the operation and maintenance of existing pipelines. The Secretary regulates pipeline safety under HLPSA and its companion statute, the Natural Gas Pipeline Safety Act of 1968 (NGPSA), 49 U.S.C. §§ 1671–1686 (enacted 1968), through the Office of Pipeline Safety (OPS) which is part of the Research and Special Programs Administration (RSPA). OPS has direct responsibility for enforcement of HLPSA and the safety regulations promulgated under it. *See* generally 49 C.F.R. §§ 190.1–195.440. The National

Transportation Safety Board (NTSB), which also plays an important role in this case, is not a regulatory agency. NTSB is "an independent Government Agency located with the Department of Transportation [established] to promote transportation safety by conducting independent accident investigations and by formulating safety improvement recommendations." 49 U.S.C. § 1901(1).

There is very little evidence about past contact between Williams and OPS. Only two OPS investigators are responsible for inspecting 113 pipeline operators in 10 states, including Minnesota, for compliance with safety regulations and for the investigation of most accidents. The last non-accident-related inspection of Williams' locations in Minnesota apparently took place in August 1984.

A General Accounting Office chart apparently prepared for Congressman Bruce Vento, submitted here by Mounds View, identifies 20 OPS inspections of Williams' locations in at least 7 states since 1980. Seven of these inspections are characterized as "routine," two as visits to "witness a test," and the remainder as accident investigations. In six cases, including one accident investigation, no violation was noted. In four cases, including two accident investigations, warning letters were issued and cases closed. The violations in these cases involved failure to mark a Kansas pipeline route with warning signs, use of a pump without pre-testing in Minnesota, the need for protective covering for exposed pipe in "various locations," and lack of operating procedures concerning pressure in Owatonna, Minnesota.

In eight other inspections, including the one at issue here, OPS found probable violations. A compliance order was issued after OPS found that a Roseville, Minnesota terminal manifold had been installed "without 100 percent testing." OPS imposed a fine of $1000 against Williams for

---

5. The pressure of the pipeline contents is measured in p.s.i.g., pounds per square inch gauge. Hydrostatic testing involves filling the line with water, which is then elevated to a test pressure higher than the intended operating pressure. If the line endures this higher pressure for the specified period of time without failing, it has been successfully tested.

failure to report a Superior, Wisconsin rupture,[6] and issued a proposed hazard order in response to a Maplewood, Minnesota accident. Seven follow-up inspections were made over a ten-month period, and it was eventually agreed that Williams would recondition the pipeline. In two cases, OPS charged that Williams was operating above maximum pressure: in Iowa, this resulted in a follow-up inspection and compliance orders; the Kansas case was withdrawn due to "new data". Two cases involved failures of pipe seams: OPS issued notices of probable hazardous condition in both cases and "action [is] pending." Finally, in two 1986 cases, "inspection results have not been resolved."

Both OPS Central Region Chief Edward Ondak and OPS Director Robert Paullin have stated that they do not believe that fines are appropriate responses to ongoing safety problems. Rather, they believe that operators should spend their money correcting the problems. Paullin has stated, however, that if OPS orders were ignored, he would turn matters over to the Justice Department for criminal prosecution.

## C. July 8, 1986

On July 8, 1986, at approximately 4:20 a.m., a Williams terminal operator in Minnesota noted a sudden and considerable drop in pressure on Line 2N. About one minute later, a dispatcher in Tulsa received an alarm from Minneapolis indicating that the pressure on that line had dropped from more than 1400 p.s.i.g. to 37 p.s.i.g. The terminal operator and dispatcher contacted each other and fellow employees and began to look into the possible causes of the sudden drop. It appears that they intended fully to shut off the flow of product, but an open valve permitted the product to continue to flow back to the site of the leak. Within 15 to 45 minutes, Williams personnel began to plan for mobilization of a maintenance crew to respond to a possible leak and to make efforts to locate the possible leak. There was no immediate effort

to contact local police, fire, or other officials.

Line 2N had ruptured at about 4:20 a.m., and was, according to NTSB, spewing unleaded gasoline. Vaporized gasoline was in the air and liquid gasoline flowed along the streets of Mounds View. About 20 minutes later, the gas vapor was ignited by sparks from an automobile. The result, states NTSB, was an explosion and then a rapid spread of fire along the path of the liquid gas. At 4:44 the Ramsey County Sheriff's Department (RCSD) learned of the emergency. The first fire department unit arrived at approximately 4:50 and evacuation began a few minutes later. At 5:00 a.m., the RCSD notified Williams of the fire and resulting injuries. Williams's General Manager for Operations began contacting members of the company's emergency task force at 5:25. The first Williams's official apparently arrived at the scene of the disaster about ten minutes later. It is not clear when Williams' workers realized that gasoline was continuing to flow back to the fire, but at 5:20 the company dispatched someone to close the valve that was permitting the backward flow. The valve was not actually closed until approximately 6:00. It appears that persons closer to the valve, who could have shut it more promptly, were either unreachable or under the impression that the problem was already under control. The flames were put under control at about 6:05 a.m. Williams asserts that more than 22,000 gallons of gasoline spilled. Mounds View officials believe this is an underestimate.

Later on July 8, the Mounds View City Counsel adopted a now-rescinded ordinance prohibiting restarting of the line until Williams gave certain assurances that Mounds View citizens were safe and paid all property damages. On July 14, Mounds View adopted another now-rescinded ordinance prohibiting repairs of the pipeline without a city permit. In a July 28, 1986 resolution, the Ramsey County Board of Commissioners resolved to reserve for itself all authority previously delegated to

---

**6.** This appears to be the only fine levied by OPS against Williams.

the county engineer.[7] The parties filed these actions in state and federal court on August 13 and 14.

### D. OPS Action

Immediately after the accident, the parties, the State of Minnesota, OPS, and NTSB began to investigate. On July 11, after some preliminary investigation, OPS issued a final order requiring Williams to take certain steps, including hydrostatic testing, visual examination of failures, and metallurgical examination of seam failures, before reopening the line. On August 22, this court granted a limited restraining order permitting Williams to proceed with testing preparations only, but without interference by the other parties. On the same day, OPS issued an amendment to the final order. RSPA Administrator Cynthia Douglas asserted that the amendment resulted from extensive discussions with Mounds View officials.[8]

The final order, as amended, provided that Williams was to "take certain measures before the Line is returned to operation and to restrict operations once they are commenced." A few of the provisions are of particular importance here. Specifically, Williams was to test the entire line hydrostatically at 1900 p.s.i.g. and to examine any failures visually and metallurgically in the presence of OPS staff.[9] Williams was also to comply with an Operational Reliability Analysis (ORA), which was made a part of the final order by the amendment. The ORA consists of five "tasks." The first is the metallurgical examination of any portions of the line that had failed. Task two is "characterization of the fracture toughness and the fatigue

crack-growth rate of the ERW seam material." Task three is designed to determine the extent to which the ERW seam is susceptible to corrosion. The fourth task involves a review of pipeline inspection techniques that might replace or supplement hydrostatic testing and a "brief" investigation of warning systems. The fifth aims to predict the "cycles of failure of a flow which just survives a hydrostatic test" and to recommend a future testing program "to deal with any suspected selective corrosion." Williams could resume operation only after approval by the OPS regional chief of the hydrostatic testing, metallurgical testing of failures, and preliminary results of the ORA, but could not operate at pressures greater than 900 p.s.i.g. until it could "demonstrate to the Director, OPS, that resumption at a higher operating pressure would be safe."[10]

On October 3, 1986, OPS issued a Notice of Probable Violation and Proposed Civil Penalty relative to four safety violations allegedly committed by Williams. DOT officials have declined to discuss the details of these notices or even identify the regulations they involve. The Director has stated that it would be improper to discuss these matters until they are closed.

### E. Testing

On September 16 and 17, the parties filed stipulations, which the court approved, permitting Williams to proceed with its hydrostatic testing program. Hydrostatic testing then began on September 17. The testing of the pipe that burst on July 8, 1986 is complete. A second set of tests, required by the Final Order and the ORA, was not

---

7. Williams makes much of this county action, comparing it to the now-rescinded city ordinances. The county argues that its resolution did nothing to alter the rights or responsibilities of the parties to the 1957 agreement, but merely shifted the responsibilities within the county itself.

8. The amendment also appears to respond to a letter from NTSB which challenged certain preliminary conclusions and procedures in the final order.

9. The chief of OPS's Central Region could waive metallurgical testing if it was unnecessary, but it does not appear that he did so.

10. The final order did permit operation of the northern sections of the line between Wrenshall and Duluth and Superior at no more than 600 p.s.i.g. The parties subsequently reached a stipulation, which the court approved, permitting low-pressure operation of the pipeline from Superior Junction to Duluth and Superior.

complete at the time of the hearing before this court.

The testing of the pipe that burst on July 8, 1986 was conducted by representatives of OPS, NTSB, Mounds View and Williams. The report of the group's factual findings was issued on behalf of the four evaluators by Richard Kielty, an expert retained by Mounds View.[11] The team conducted a complex series of test. The 40 foot, three inch section removed from Mounds View contained a rupture of about 90 inches. The rupture, which ran along the weld, gradually spread to .31 inches at the widest points (at the 72 and 77 inch marks). The team concluded that the fracture probably originated at the 72 inch mark, but was unable to reach any conclusion about the 77 inch mark. While the entire internal surface and most of the external surface was largely uncorroded, with many areas in almost new condition, the experts observed corrosion on the exterior near the weld seam at the 72 and 77 inch marks—the locations of the .31 inch fractures. Use of an electron microscope disclosed evidence of a "brittle fracture" and no evidence of fatigue. A metallographic evaluation of the 72 and 77 inch locations showed deformed grain flow patterns and certain defects—including one defect which penetrated most, but not all, of the way through the pipe wall. A radiographic examination of sections of the 40 foot length disclosed some areas with sharp linear indications, but subsequent hydrostatic testing of two of these sections demonstrated no weakness: they burst only at 4250 and 4450 p.s.i.g.

The second set of tests, the subject of the ORA, was being performed by Williams consultant Packer Engineering at the time of the hearing before the court. Packer's preliminary report indicated that the hydrostatic testing program had been completed. Five failures had occurred—one related to flanges which were replaced, one "a corrosion induced leak near a valve," and three seam splits. After replacement of these portions of the line, it tested successfully at 1900 p.s.i.g.

Packer's test involved 57 pipe samples: the four fractured segments from Line 2N; five fractured segments taken from another line, constructed of the same type of pipe, which had been hydrostatically tested at the same time; approximately 20 samples removed from various locations on the 2N line before hydrostatic testing, including the length directly north of the accident site; and other samples obtained during previous repairs and header installations. These 57 samples were subjected to various procedures, including magnetic, ultrasonic and x-ray testing. Eight intact samples[12] were subjected to hydrostatic testing until they burst at pressures ranging from 1910 to 4850 p.s.i.g. These eight samples and the seven original test failure segments were subjected to an additional set of tests. With the exception of the sample found near the valve, Packer testers observed no corrosion on the 57 samples.[13] Morin also concluded that there was no evidence of fatigue. While he described the pipe coating as being in good condition, he did note the existence of perhaps 200 "holidays" or flaws in the coating on the 57 samples. Some or many of these may have resulted from post-removal handling. Of the seven samples split by hydrostatic testing, six had weld imperfections of varying depths. Morin concludes that these flaws are manufacturing defects. He also found other seam weld defects, but asserts that they are stable, rather than deteriorating, and that there is no evidence of progressive flaw growth.

### F. Cathodic Protection

Line 2N is coated pipe which, by industry practice and under 49 C.F.R. § 195.414,

---

**11.** The other participants do not subscribe to certain of Kielty's interpretations of the data, however.

**12.** The samples were the worst from Mounds View and the rest of the line, according to Packer president Charles Morin.

**13.** At the time of the hearing, Williams was excavating additional samples from the areas identified as inadequately cathodically protected over the preceding five years.

must be adequately cathodically protected. The coating on such pipes normally protects them from corrosion, but flaws in the coating may leave portions vulnerable. Cathodic protection is supposed to protect such vulnerable areas from corrosion and to thwart the growth of corrosion that is present. The general industry standard for cathodic protection, to which Williams apparently subscribes, is negative .85 volts. During the investigation of the accident, it emerged that portions of the pipeline had not been adequately protected. Williams' records on the pipe to soil potential of Line 2N indicate that portions of the first ten miles of the line, which also includes the accident site, were inadequately protected during much of 1981 through 1986. OPS officials have stated that they assumed that they would have seen these documents, but denied any knowledge of inadequate cathodic protection. Senior Williams' officials also assert that apparent problems with cathodic protection were never brought to their attention. Testimony at the hearing indicated that OPS has informed Williams that it will not permit operation of the line until it receives a written report evidencing current adequate cathodic protection.

## G. Expert Evaluation

Each of the parties submitted statements of expert witnesses. Richard Kielty, who had tested the Mounds View pipe segment, was called by the city to testify at the hearing, as was James Tidwell. Williams called Charles Morin and John Kiefner, who had prepared the ORA and were involved in the testing under it. The parties also submitted many affidavits, some by witnesses who were present at the hearing, and one deposition. Ramsey County submitted the affidavit of John Slater, an expert on corrosion. Mounds View had previously submitted a September 3 affidavit of

Paul Wright, and Williams offered portions of his deposition. Mounds View also provided the court with transcripts of testimony before a NTSB hearing, where witnesses included several experts. The record indicates substantial agreement on some points, but also some important disputes on the causes of the accident and the safety of reopening the line.

There appears to be consensus that the Mounds View fracture and other fractures in the line were at least partially caused by incomplete welding during the manufacturing process, so-called "lack of weld fusion" flaws. The experts also agree that the problem is brittle fractures. There appears to be no evidence of fatigue. The experts also appear to agree that the pipeline coating is in very good condition on most parts of the line.

The witnesses strongly disagree, however, about the role of corrosion in this scheme. Experts for Mounds View and Ramsey County point to corrosion found near the apparent source of the July 8, 1986 break and the apparent absence of cathodic protection. They believe that active corrosion is probably a major problem on Line 2N.[14] Williams' experts, stressing the absence of corrosion on almost all other samples, assert that the condition of the Mounds View segment "appears to be a totally unique circumstance." Williams experts agree that cathodic protection is a necessary part of preserving the pipeline's integrity, but they are not persuaded that cathodic protection problems have, in fact, seriously damaged the line.

The experts also have divergent views on the efficacy of hydrostatic testing of ERW pipelines such as the instant one. No one has argued that hydrostatic testing is perfect. All experts agree that it exposes only defects large enough to succumb to the test pressure. Less substantial flaws remain undetected. Williams' experts

14. It appears that these experts have not had an opportunity to review the evidence on the other samples tested under the ORA. It is therefore not clear whether the results of those tests would alter their viewpoints. Mounds View expert witness Richard Kielty, of Twin City Testing Corporation, testified that it was unlikely, but not impossible, that corrosion would not be found at other locations on the line. If the absence of active corrosion were proven, he testified, he would have no objection to the operation of the pipeline.

strongly assert that hydrostatic testing remains the state of the art. John F. Kiefner of Battelle Memorial Institute, a Williams consultant, argues in a recent paper that hydrostatic testing is the best way of predicting pipeline integrity.[15] J. Kiefner, Evaluating Pipeline Integrity (1986).

Experts for the city and county are troubled by two aspects of hydrostatic testing. First, they are concerned that the pipeline is actively corroding and that hydrostatic testing cannot identify places where active corrosion will cause flaws to grow. Second, they are concerned about the "pressure reversal phenomenon." Pipelines that survive testing at relatively high pressures have subsequently failed at lower pressures.[16] The NTSB expressed concern about pressure reversal in its August letter to DOT, and noted a case of a pressure reversal of 62%—that is a failure at only 38% of the previous test pressure. Williams takes the position that pressure reversal is not so great a problem and is predictable.[17] Williams argues that a sufficiently high ratio of test pressure to operating pressure minimizes any risk. As Kiefner has noted, it is "the ratio of test pressure to operating pressure [that] has significance with regard to the margin of assurance of pipeline integrity." *Id.* at 15–3. He argues that the likelihood of a pressure reversal of 10% is only one in 100, while the likelihood of a 33% pressure reversal is only one in 10 million. *Id.* at 15–8. On this theory, any failure at 900 p.s.i.g. after testing at 1900 p.s.i.g., a pressure reversal of 53%, is extremely unlikely. A failure at 1400, on the other hand, while still relatively unlikely, is far more probable, as the Mounds View incident itself may suggest.

There is a consensus among the experts that at least two years of operation at 900 p.s.i.g. should not be unsafe if adequate cathodic protection and other safety precautions are observed. Kiefner testified that short-term operation at 900 p.s.i.g. is safe even if there were a corrosion problem which might cause problems in the future. Mounds View's own experts testified that corrosion is a long term, rather than an immediate problem, and operation at 900 p.s.i.g. is safe, at least for the relatively short term.[18]

*Discussion*

This matter is now before the court on motions for preliminary relief, not for final determination of the important and complex issues raised. The factual and legal contours of the dispute have been substantially altered since the first hearing—certain issues are no longer in dispute, others have been raised only recently, and the entire situation now appears quite different than it did in August. However, the record is still incomplete,[19] and the parties' argu-

15. Kielty recommended the use of alternative forms of "on line" testing and replacement of those sections which appeared damaged. Kiefner argues that existing methods of on-line inspection are impractical.

16. The extent to which this may have occurred on line 2N is not yet known. The Mounds View pipeline had been tested to approximately 1900 p.s.i.g. in 1984, yet it failed at less than 1500 p.s.i.g. in 1986. Mounds View and Ramsey County claim that there were many other examples of such failures, but Williams argues that they have not properly matched up the sections tested in 1984 and those tested in 1986. Williams witness Kiefner states that there were only five or six cases of pressure reversal and most were very small reversals.

17. The parties also appear to disagree about the causes of pressure reversal. Mounds View suggests that hydrostatic testing itself may cause weakening on the line, making future failures at lower pressure more likely. Kiefner asserts that this is untrue, but difficult to disprove.

18. This testimony concerned only the integrity of the pipeline itself. No one has suggested that the line should be operated without adequate cathodic protection. Safety is, of course, relative. No party and no expert has suggested that any operating pipeline is, or could be, 100% safe.

19. The facts are still emerging. During the pendency of these motions, work on the ORA has continued. Williams also planned to remove and test additional sections from the inadequately cathodically protected sections of the line. Hearings have been conducted before several other bodies. NTSB held two long days of hearings in October and has made other efforts to investigate the accident; it is expected to issue a detailed report. The Minnesota Commission on Pipeline Safety, formed by the Gov-

ments are not fully developed. In such circumstances, the court's evaluation of the matters before it is necessarily tentative.

On motions for preliminary injunctions, the court must consider four factors: (1) the probability that the movant will succeed on the merits, (2) the threat of irreparable harm to the movant during the pendency of the litigation, (3) the balance between that harm and any injury that the temporary relief would inflict on other parties; and (4) the public interest. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981). A preliminary injunction is an extraordinary remedy, and the burden is always on the moving party to demonstrate entitlement to that relief.

There are three cases at issue here, but the claims and issues are intertwined. The parties' legal positions have shifted somewhat during the progress of the actions. Each party claims, however, that it is likely to succeed on the merits, that it will be irreparably harmed if its motion is denied, that the balance of harms strongly favors granting the relief it seeks, and that the public interest is squarely on its side.

In *County of Ramsey v. Williams Pipe Line Co.*, Civ. No. 4–86–651, the county seeks a declaratory judgment and injunction barring Williams from entering onto county land—part of the pipeline route— without the county's permission. The county initially stressed its rights as a property owner, but now argues more broadly that it is entitled under state property and contract law to demand compliance with the provisions of a 1957 agree-ment between the county and Williams' predecessor pipeline company.

The city filed *City of Mounds View v. Williams Pipe Line Co.*, Civ. No. 4–86–656, seeking abatement of nuisance. It now stresses its counterclaim in *Williams Pipe Line Co. v. City of Mounds View*, Civ. No. 4–86–648, which asserts not only nuisance, but also a claim under the HLPSA citizens civil action provision, 49 U.S.C. § 2014.[20]

In *Williams v. City of Mounds View*, and in its answers in the other cases, Williams has characterized its opponents' claims as efforts to regulate pipeline safety. It asserts that HLPSA expressly or impliedly preempts all but the claim under the HLPSA citizens suit provision.[21] In Williams' view, the citizens suit counterclaim is also barred by Mounds View's failure to satisfy certain prerequisites to its filing and by the doctrine of primary jurisdiction.

*A. Likelihood of Success on the Merits*

*1. Mounds View's Citizens Civil Action*

In its counterclaim in Civ. No. 4–86–648, Mounds View seeks to bring a citizens civil action pursuant to 49 U.S.C. § 2014. Williams asserts that Mounds View has failed to meet the legal requirements for bringing such an action. The citizens civil action section of HLPSA provides in part

(a) Injunctive relief

Except as provided in subsection (b) of this section, any person may commence a civil action for mandatory or prohibitive injunctive relief, including interim equitable relief, against any other person

---

ernor to study the pipeline situation, has also held hearings; it recently issued a report recommending government and industry action to improve pipeline safety. Members of Congress have also taken an active interest in the accident and in improving pipeline safety. Finally, the OPS investigation into the accident and Williams' alleged violations of HLPSA has been continuing.

**20.** In an amended counterclaim filed after the hearing, Mounds View added claims for property and punitive damages. These claims are not now before the court.

**21.** Williams has also asserted that certain of the other parties' claims are unconstitutional burdens on interstate commerce, in violation of Article I, § 8, cl. 3, or impairments of its contractual relationships, in violation of Article I, § 8, cl. 1. These arguments, along with other constitutional challenges, were initially directed at the now-rescinded emergency ordinances. Williams has not developed its constitutional arguments at this stage of the litigation or shown that it is likely to prevail on them.

... who is alleged to be in violation of this chapter or of any order or regulation issued under this chapter. ....

(b) Restrictions

No civil action may be commenced under subsection (a) of this section with respect to any alleged violation ...

(1) prior to expiration of 60 days after the plaintiff has given notice of such alleged violation to the Secretary ... and to any person who is alleged to have committed such violation; or

(2) if the Secretary ... has commenced and is diligently pursuing administrative proceedings or the Attorney General of the United States ... has commenced and is diligently pursuing judicial proceedings with respect to such alleged violation.

49 U.S.C. § 2014(a) and (b). Williams asserts that Mounds View's counterclaim under this section must fail because the city failed to comply with the notice requirement and because the Secretary is "diligently pursuing administrative remedies."

a. *Actions of Mounds View and OPS*

The restrictions of § 2014(b) turn on the actions of Mounds View and of DOT. A series of communications between Mounds View and OPS have particular relevance.

On August 18, 1986, counsel for Mounds View wrote a letter to the Secretary [22] stating that the city was "putting [her] on notice ... that ... Williams ... was operating an interstate hazardous liquid pipeline in violation of 49 U.S.C. § 2006(a)(1) and 49 C.F.R. § 195.401," which require pipeline operators to comply with federal safety standards. Counsel stated that the letter was "strictly a formality" because DOT and Williams had known that the pipeline involved in the explosion was "inherently defective and subject to unpre-

dictable rupture and explosion." The Director of OPS (the Director) responded to the letter on September 11, stating that he did not believe that Williams was in violation of 49 C.F.R. § 195.401, which "requires action if an operator discovers any condition that could adversely affect the safe operation of its pipeline system." Williams had conducted hydrostatic testing, "an accepted method of locating and eliminating flaws from a pipeline," in 1984. "Based on existing technical knowledge," the Director stated, "this test should have removed any condition that could have adversely affected the safe operation of this pipeline including inherent seam defect." The Director stated that OPS had not found anything to indicate that Williams knew of any problems following the 1984 testing. He invited Mounds View to advise OPS if it had contrary information.

On September 3, before receiving the response to its earlier letter, Mound View served the Secretary with a copy of its answer and counterclaim in Civil No. 4–86–648. The cover letter stated that "the DOT has had notice of many, if not all, of the [eight] alleged violations for more than sixty days." On October 6, 1986, the Director again wrote to Mounds View and commented on the counterclaim. The Director disputed some of the city's allegations, but agreed with others.[23] The counterclaim asserts a violation of 49 C.F.R. § 195.210, which requires that pipeline locations "be selected to avoid, as far as practicable, areas containing private dwellings, industrial buildings, and places of public assembly." The Director, noting that this regulation prescribes requirements only for the construction of new pipeline systems, replied that the standard did not apply to Williams' right-of-way, which pre-dated the regulations. Mounds View also asserted

**22.** Mounds View has sent copies of this and all other relevant letters to the Director of OPS and to Williams.

**23.** Williams' position appears to be that it did not violate any of the applicable regulations. Company officials have asserted that improvement of written manuals, procedures, and performance is always possible, but that any imper-

fections on its part do not rise to the level of violations of specific regulatory requirements. It also denies any violation of the broader requirement of § 195.401(b), which requires reasonably prompt response to known safety problems and immediate cessation of operations in response to immediate hazards.

violations of 49 C.F.R. § 195.310(b)(8), which requires records of hydrostatic testing, including "explanation[s] of any pressure discontinuities, including test failures, that appear on the pressure recording charts." The Director responded that this regulation was inapplicable to the assertedly improper record keeping following the 1984 test because § 195.310 did not take effect until 1985. The predecessor rule, the Director stated, required only that "discontinuities be explained on the pressure chart," and Williams had complied with this rule.

Mounds View's third assertion of violation concerns 49 C.F.R. § 195.401(b). This regulation requires a pipeline operator to correct "any condition that could adversely affect the safe operation of its pipeline system" within a reasonable time of discovery. If the condition "presents an immediate hazard to persons or property, the operator may not operate the affected part of the system until it has corrected the unsafe condition." The Director stated, however, that OPS was "not aware of any instance wherein, after discovery, Williams failed to correct a known condition that could adversely affect the safe operation of the pipeline or present an immediate hazard to persons or property." He stated that Williams "could not have been expected to know about the defect which led to the Mounds View failure."

Mounds View also asserted that Williams had violated many subsections of 49 C.F.R. § 195.402, requiring pipeline operators to prepare, periodically revise, and follow "a manual of written procedures for conducting normal operations and maintenance activities and handling abnormal operations and emergencies." Under § 195.402(c)(4), the manual must include procedures for determining "which pipeline facilities are located in areas that would require an immediate response by the operator to prevent hazards to the public of the facilities failed or malfunctioned." The Director

agreed that the procedural manual was deficient in this respect, and stated that OPS had requested "appropriate changes pursuant to § 195.402(b)." "Final action" had not yet been taken "in regard to correcting the recognized deficiencies." The Director also agreed that Williams had probably violated 49 C.F.R. § 195.402(c)(12), which requires procedures for liaison with "fire, police, and other appropriate public officials to learn the responsibility and resources of each government organization that may respond to a[n] ... emergency and acquaint the officials with the operators' ability to respond to a[n] ... emergency and means of communication." OPS was pursuing "appropriate," but unspecified enforcement actions. The Director also noted deficiencies with respect to those sections of 49 C.F.R. § 195.402(e) requiring procedures for "[h]aving personnel, equipment, instruments, tools and material available as needed at the scene of an emergency," and for "notifying fire, police, and other appropriate officials" of emergencies. He stated that OPS was requiring amendment of the manuals.

OPS took issue with Mounds View's last two allegations: that Williams had violated 49 C.F.R. § 195.408(b), by failing to establish and maintain an adequate communication system, and 49 C.F.R. § 195.440, by failing to establish "a continuing education program to enable the public, appropriate government organizations, and persons engaged in excavation related activities to recognize a hazardous liquid pipeline emergency and report it...." The Director stated that Williams had an adequate communication system and had conducted or participated in enough media educational programs to comply with regulations.

On September 25, Mounds View wrote a third, "notice letter" to the Secretary, asserting violations of 49 C.F.R. § 195.-414(a),[24] which requires adequate cathodic protection, and asserting that it believed

24. Mounds View has included this claim in its amended counterclaim. It has also alleged additional violations of regulations requiring the preparation of and compliance with a procedur-

al manual (49 C.F.R. §§ 195.402(c)(4)–(6)) and violations of regulations relating to personnel training (49 C.F.R. § 195.403).

that DOT knew of this deficiency well before July 8, 1986. The court is not aware of any OPS response to this letter.

### b. Notice

Williams first argues that neither it nor the Secretary had proper notice of Mounds View's intent to file a citizens action, as required by 49 U.S.C. § 2014(b)(1).[25] It relies on cases dismissing citizens suits for failure to comply with the notice provision. *See, e.g., City of Highland Park v. Train,* 519 F.2d 681, 690–91 (7th Cir.1975) (where plaintiffs "made no attempt whatsoever to comply with the notice provision, their suit [under the Clean Air Act] could not properly be commenced."), *cert. denied* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976)); *South Carolina Wildlife Federation v. Alexander,* 457 F.Supp. 118, 125 (D.S.C.1978) (where notice failed to identify two of three dams alleged to be sources of violations, defendants did not have "notice sufficient to allow possible administrative resolution of the claim on those projects," and the court therefore lacked jurisdiction over those claims.)

Mounds View responds that it has substantially complied with the notice requirement, that Williams and DOT had constructive notice of the claims, and that the purposes of the notice requirement have been satisfied.[26] It relies on cases in which courts have recognized the special role of citizens actions, and declining to dismiss them by overly literal interpretations of notice requirements. *See e.g., Proffitt v. Commissioners,* 754 F.2d 504 (3d Cir.1985) (citations omitted).

> The purpose of the sixty-day notice requirement is to obviate the need for resort to the courts by prompting either administrative enforcement of the laws or voluntary compliance with alleged violators....

... citizen[s] are not to be treated as nuisances or troublemakers, but rather as welcome participants in the vindication of environmental interests. ... [T]he sixty-day notice provision should be applied flexibly to avoid hindrance of citizen suits through excessive formalism.

*Id.* at 506. Although the *Proffitt* plaintiffs did not give formal notice until the day they filed their amended complaint, their claim was not barred because they had given earlier notice to county authorities, who had discussed the claims with the proper federal authorities. The Eighth Circuit has also rejected excessive formalism. In *Hempstead County and Nevada County Project v. United States Environmental Protection Agency,* 700 F.2d 459, 463 (8th Cir.1983), the court found jurisdiction proper under the Resource Conservation and Recovery Act citizens suit provision where "the purpose of such notice [had] long since been satisfied."

Even most of the authority cited by Williams supports the position that strict compliance with a 60–day notice requirement may, under certain circumstances, be unnecessary. *See e.g., Pymatuning Water Shed Citizens for A Hygienic Environment v. Eaton,* 644 F.2d 995 (3d Cir.1981) (approving lower court ruling permitting plaintiffs to give notice and wait 60 days before proceeding with previously filed suit); *City of Highland Park v. Train,* 519 F.2d 681 (7th Cir.1975) (suit improper where plaintiff made "no attempt whatsoever to comply"); *Biederman v. Scharbarth,* 483 F.Supp. 809 (E.D.Wis.1980) (finding insufficient notice on facts of case, but noting that "in some situations 'constructive notice' founded on actual notice may suffice."); *South Carolina Wildlife Federation v. Alexander,* 457 F.Supp. 118 (D.S.C.1978) (question is "whether or not plaintiffs have substantially complied").

---

25. Although § 2014(b) provides that notice "shall be given in such manner as the Secretary shall prescribe by regulation," the Secretary has not promulgated any regulations under that authority.

26. Mounds View also argues tht § 2014(b) restrictions should apply only to plaintiffs' citizen suits, and not to counterclaims such as the instant one. The peculiar posture of this litigation is relevant, but Mounds View has not shown that it permits the parties or court to ignore § 2014(b).

49 U.S.C. § 2014(b)(1) does not appear to bar Mounds View's counterclaim. There is nothing in the statute or regulation to suggest that the required notice must detail the nature of each alleged violation. Williams and DOT had actual knowledge of the city's belief that Williams had violated a number of regulations in its operation of the pipeline. The purposes of the notice requirement appear to have been met—both Williams and DOT had more than sixty days to take action between their first notice of the alleged violations and any court action on the citizens suit counterclaim. Moreover, Mounds View filed an amended complaint more than 60 days after giving detailed notice of the alleged violations. It appears that the amended complaint cures any defects in complying with the notice requirement. *See Proffitt v. Commissioners*, 754 F.2d 504 (3d Cir.1985) (looking to date of amended complaint in assessing timeliness); *Loveladies Property Owners Assoc., Inc. v. Raab*, 430 F.Supp. 276, 280 (D.N.J.1975) (same), *aff'd* 547 F.2d 1162 (3d Cir.1976), *cert. denied* 432 U.S. 906, 97 S.Ct. 2949, 53 L.Ed.2d 1077 (1977). *Cf., Pymatuning Water Shed Citizens for A Hygienic Environment v. Eaton*, 644 F.2d 995 (3d Cir. 1981) (declining to require refiling of suit for lack of perfect compliance with notice requirements).

### c. Diligent Pursuit

A citizens civil action is also barred if DOT was "diligently pursuing administrative proceedings" at the time of commencement. *Cf., Connecticut Fund for the Environment v. Job Plating Co.*, 623 F.Supp. 207 (D.Conn.1985) (bar applicable only where agency was diligently pursuing action before commencement of litigation). The fact that the agency is taking some

action does not, in itself, satisfy the "diligent pursuit" requirement. This restriction on citizen's actions "was intended to preclude citizen suits only when comparable action by an administrative agency is underway, not whenever an agency sees fit to approve the actions of private parties subject to its jurisdiction." *Student Public Interest Research Group Inc. v. Georgia-Pacific Corp.*, 615 F.Supp. 1419, 1427 (D.N.J.1985) (interpreting similar citizens' action restriction in Clean Water Act). A determination of what constitutes diligent pursuit "must rest at least in part on the agency's enforcement record." *Gardeski v. Colonial Sand & Stone Co.*, 501 F.Supp. 1159, 1164 (S.D.N.Y.1980) (interpreting similar provision in Clean Water Act). Past performance is not dispositive; the court must "consider the full context of the agency's actions. An evaluation of 'diligence' measures comprehensively the process and effects of agency prosecution." *Student Public Interest Research Group, Inc. v. Fritzsche, Dodge & Olcott, Inc.*, 579 F.Supp. 1528, 1535 (D.N.J.1984), *aff'd* 759 F.2d 1131 (3d Cir.1985).[27]

The present record does not permit a dispositive ruling on whether DOT's actions were sufficiently diligent to preclude commencement of a citizens civil action. The record on OPS's past enforcement efforts is scant. Mounds View stresses the small number of OPS employees responsible for overseeing safety regulation compliance, OPS's apparent ignorance of Williams' long-term problems with cathodic protection, and OPS's reluctance to impose monetary penalties. The city argues that OPS is both unable and unwilling properly to enforce HLPSA and that Williams has no incentive to comply with the applicable regulations. On the other hand, Williams and DOT officials appear to agree that

**27.** Mounds View argues that an administrative agency's failure to allow citizens to participate in agency actions provides a basis for allowing a citizens action. The cases it cites in support of this position involve statutes providing for citizen intervention in agency litigation. *See, e.g., Sierra Club v. SCM Corp.*, 572 F.Supp. 828, 830 (W.D.N.Y.1983) (§ 505 of the [Clean Water] Act was included to ensure that interested citizens

either had the right themselves to commence an enforcement proceeding in federal court, or, if that enforcement proceeding had already been initiated, the right to intervene ... in order to actively participate in the enforcement effort"); *Love v. New York State Department of Environmental Conservation*, 529 F.Supp. 832 (S.D.N.Y. 1981) (right to intervene reserved to those whose suits are precluded by statute).

OPS's more cooperative approach to regulation has been effective. The record at this point is not clear.[28]

The record on DOT's reaction to the July 8 accident is relatively more complete. It appears that OPS has actively investigated the accident. Although it issued a final order only days after the accident, this order stressed testing and prohibited immediate reopening of the line. On the basis of "additional information," the Director issued an amendment, and has repeatedly noted that further information may require additional amendments. In response to information about cathodic protection problems, OPS has also required action on those problems before considering renewed operation. Williams may not reopen the line, even at relatively low pressure, without specific OPS approval.

The Administrator of DOT's Research and Special Programs Administration, which oversees OPS, has described the ORA as "without precedent in the pipeline industry." She states that it will "serve to provide both short term and long range assurances of the safe operation of this pipeline...." Experts have also testified that the testing program is unusually cautious. OPS Director Paullin has stated that the investigation being conducted involves ten to twelve OPS staff members and is more comprehensive than all but a few other investigations ever conducted by OPS. Mounds View asserts that any decision to permit reopening of the line before completion of the ORA and correction of all safety violations would be evidence of lack of diligence. But all experts agree that if Williams were in compliance with other OPS requirements, such interim operation would not create unusual risk. The record does not indicate that OPS will permit Williams to renew operations before reasonable safety can be ensured.

In the coming period, OPS will rule on the Williams request to reopen the pipeline at reduced pressure, NTSB will issue its report on the accident, and hearings will be held on the violations OPS has alleged. OPS has apparently refused to permit use of the line until adequate cathodic testing is in place. A final ruling on whether diligent pursuit bars this citizens' action must await a more fully developed record. On the present record, it appears more likely than not that Williams will prevail on this issue.[29]

**28.** Congress has, in the past, expressed considerable concern about the DOT's pipeline safety enforcement efforts. *See* S.Rep. 96–182, 96th Cong., 1st Sess. 2–3, *reprinted in* 1979 U.S.Code Cong. & Admin.News 1971, 1972–73. The Pipeline Safety Act of 1979, which amended NGPSA and created HLPSA, was designed in part to improve that enforcement, *id.*

**29.** Williams has also argued that the doctrine of primary jurisdiction requires summary judgment on Mounds View's citizens civil action claims.
Primary jurisdiction applies where "enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pacific Railroad Co.* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) (citation omitted). The doctrine does not, however, require that every claim touching on a regulated industry be first submitted to the regulatory agency. *See e.g., Nader v. Allegheny Airlines,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976) (primary jurisdiction did not apply

to common law tort action against airline). Even where primary jurisdiction applies, it generally does not defeat the court's jurisdiction or provide a basis for granting summary judgment; it merely delays judicial consideration of a claim until the proper regulatory agency has given its views on the matter. *E.g., United States v. Philadelphia National Bank,* 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963) ("Court jurisdiction is not thereby ousted, but only postponed."); 4 K. Davis Administrative Law Treatise § 22:1, at 82–83 (2d ed. 1983). Primary jurisdiction is inapplicable where Congress clearly intends that courts take action without deferring to regulatory agencies. Where, as here, a citizens suit provision makes judicial consideration if regulatory efforts appear to be less than "diligent," 49 U.S.C. 2014(b), the application of primary jurisdiction would appear problematic. *E.g. Student Public Interest Research Group Inc. v. Fritzsche, Dodge & Olcott, Inc.,* 579 F.Supp. 1528, 1537 (D.N.J.1984) (doctrine "should be invoked sparingly where it would serve to preempt a citizen's suit"), *aff'd* 759 F.2d 1131 (3d Cir.1985). *Cf., Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231, 244 (3rd Cir.1980) (Citizens

*2. Mounds View Nuisance Claim and Ramsey County Claims*

Mounds View's nuisance claim and all of Ramsey County's claims are based on common law. The threshold question on the merits of these claims is whether, as Williams argues, they are preempted by HLPSA.[30] Under the Supremacy Clause of Article VI of the Constitution, Congress may preempt state law

> in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted.... If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, ... or where the state law stands as an obstacle to the accomplishment of the full purpose and objectives of Congress....

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citations omitted); *see also, Louisiana Public Service Commission v. FCC,* — U.S. ——, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986).

■ HLPSA gives the Secretary of DOT the authority to regulate interstate hazardous liquid pipeline safety. It provides in part:

> Any State agency may adopt additional or more stringent safety standard for intrastate pipeline facilities and the transportation associated with such facilities, if such standards are compatible

with the Federal standards issued under this chapter. *No state agency may adopt or continue in force any safety standards applicable to interstate pipeline facilities or the transportation of hazardous liquids associated with such facilities.*

49 U.S.C. § 2002(d) (emphasis added). The statute thus clearly expresses Congressional intent to preempt state efforts to establish safety standards for hazardous liquid pipelines. Thus far, there are no published opinions interpreting this or any other section of HLPSA, but the courts have given effect to the virtually identical preemption clause of NGPSA, 49 U.S.C. § 1671–86. NGPSA, initially enacted in 1968, was amended in 1979 by the Pipeline Safety Act of 1979, P.L. 96–129, 93 Stat 989–1014, which also created the substantially parallel HLPSA. *See Natural Gas Pipeline Co. v. Railroad Commission,* 679 F.2d 51 (5th Cir.1982) (NGPSA preempts state railroad commission regulation requiring natural gas pipeline companies to provide certain safeguards); *Northern Border Pipeline Co. v. Jackson County,* 512 F.Supp. 1261 (D.Minn.1981) (NGPSA preempts county ordinance requiring natural gas pipeline company to bury portions of Alaska pipeline at minimum of six feet).

*a. Mounds View's Nuisance Claim*

In seeking abatement of nuisance, Mounds View reads the HLPSA preemption clause narrowly. The city appears to argue that HLPSA preempts only the setting of safety standards, and not the en-

---

suit should "not wait in what may be perpetual limbo while the agency decides whether or not to take action."), *cert. denied* 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981).

Neither Williams nor Mounds View has addressed the special issues raised by resort to primary jurisdiction in a citizens suit context. Under the circumstances, and in light of its determination on the parties' other arguments for preliminary relief, the court declines to reach the question, not posed by either party, whether the doctrine of primary jurisdiction favors staying consideration of this claim pending completion of OPS consideration.

**30.** Williams has not argued that Mounds View's newly-filed counterclaims for property or puni-

tive damages are preempted. Those claims were not added until after the hearing and they are not at issue on the question of preliminary relief. The preemption issue would be different for those claims. *See Silkwood v. Kerr-McGee,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (federal preemption of nuclear energy safety regulation does not preempt state-based claim for punitive damages against nuclear power plant operator).

Mounds View's emergency ordinances were designed to regulate pipeline safety, but they have been rescinded, and are therefore no longer at issue in this case.

forcement of those federal safety standards. Mounds View relies on 49 U.S.C. § 2014, which authorizes citizens civil actions for injunctive relief against alleged violators of the statute. The statute also provides that "[n]othing in this section shall restrict any right which any person (or any class of persons) may have under any statute or at common law to seek enforcement of this chapter or any order or regulation under this chapter or to seek any other relief." *Id.* at § 2014(d). According to the city, § 2014(d) means that HLPSA cannot preempt any state cause of action which could be brought against a pipeline company.

Mounds View reads too much into the § 2014(d) savings clause. It provides only that "this section"—the citizens civil action provision—does not preempt other remedies. The provision is "virtually identical to subsections in the citizens-suit provisions of several [other] statutes. ... [and] means only that the provision of such suit does not revoke other remedies. It ... cannot be read to mean that the Act as a whole does not supplant [other] remedies but only that the particular section authorizing citizen suits does not do so." *City of Milwaukee v. Illinois*, 451 U.S. 304, 328–329 & n. 21, 101 S.Ct. 1784, 1798 & n. 21, 68 L.Ed.2d 114 (1981) (construing Federal Water Pollution Control Act, 33 U.S.C. § 1365(e), and citing other environmental statutes containing similar provisions).

Where the federal government maintains comprehensive control over a field of safety regulation, "[p]rivate litigants ... may not obtain by way of injunctive relief pursuant to state law an order abating a nuisance, because of public safety hazards." *Commonwealth of Pennsylvania v. General Public Utilities Corp.*, 710 F.2d 117 (3rd Cir.1983) (comprehensive federal control over nuclear and safety aspects of nuclear power plants preempted state nuisance action, but not state tort action for damages). The regulatory scheme established by HLPSA is a relatively comprehensive one, and nuisance actions could well frustrate that scheme.

On the other hand, there are points not raised by the litigants which suggest that Mounds View's nuisance claim may not be preempted. First, in a subsection on "tort liability" neither discussed nor noted by any party, HLPSA provides that "[n]othing in this chapter shall affect the common law or statutory liability of any person." 49 U.S.C. § 2006(c). The import of this provision for Mounds View's nuisance claim is not obvious. The term "liability" is susceptible to different meanings. Even where a savings clause "purports to speak in absolute terms it [may be inappropriate to] read so literally." *Nader v. Allegheny Airlines, Inc.*, 512 F.2d 527, 544 (D.C.Cir.1975), *rev'd on other grounds*, 426 U.S. 290, 298, 96 S.Ct. 1978, 1984, 48 L.Ed.2d 643 (1976); *see also Texas Pacific Railway Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 437, 27 S.Ct. 350, 352, 51 L.Ed. 553 (1907) (state common law action preempted, despite existence of broad savings clause, where "preexisting right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy...."). Second, preemption should not be presumed. Where Congress enters into "a field which the States had traditionally occupied.... We start with the assumption that the historic police powers of the State were not to be superseded by Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). The parties have, thus far, done little to illuminate the intent of Congress. *See, generally,* H.R.Rep. No. 96–201 (II), 96th Cong., 1st Sess. (1979); H.R.Rep. No. 96–201 (I), 96th Cong., 1st Sess. (1979); S.Rep. 96–182, 96th Cong., 1st Sess., *reprinted in* 1979 U.S.Code Cong. & Admin.News 1971; 125 Cong.Record 13,-197–203, 25,047–53, 32,328–34, 32,753–55. *See also,* 1976 U.S.Code Cong. & Admin. News 4673 (Natural Gas Pipeline Safety Act Amendments of 1976, including addition of citizens civil action provision): 1968 U.S.Code Cong. & Admin.News 3223 (Natural Gas Pipeline Safety Act of 1968).

For present purposes, the court will assume that HLPSA does not preempt Mounds View's nuisance claim. This is not enough to show likelihood of success on the merits, however. Mounds View must also show that it is likely to prevail on its claim. The city seeks an injunction restraining Williams from recommencing pipeline operations. Relying on 49 C.F.R. § 195.210 ("pipeline right-of-way must be selected to avoid as far as practicable, areas containing private dwellings, industrial buildings and places of public assembly"), the city suggests that it may seek permanent removal. Alternatively, Mounds View seeks to require that Williams replace all pipe running through the city before reopening the pipeline at any pressure. In its most modest request for relief, the city seems to argue that operation of the pipeline should be barred at least until Williams is in full compliance with HLPSA regulations. The city's position appears to be that safety of operations cannot be ensured until Williams corrects violations of regulations relating to creation of and compliance with a procedural manual for operations, maintenance, and emergencies; to training; to communications systems; and to public education.

■ The record now before the court does not demonstrate that Mounds View is likely to show that federal safety standards require removal or immediate replacement of the entire line. 49 C.F.R. § 195.210 applies only to the construction of new lines, not to the maintenance of older lines such as the one involved here. *See id.* at § 195.200. The city provides no other basis for demanding removal of the line. There is substantial disagreement between the experts on the long-term integrity of the line, but no expert suggested that short-term operation at 900 p.s.i.g. posed any substantial danger to persons or property near the pipeline, so long as required safeguards were ensured. Mounds View expert witness James Tidwell expressly stated that three years of low pressure operation of the pipeline would not be unduly hazardous. Mounds View expert witness Richard Kielty's concern was the long-term

operation of the line, not immediate danger. Under the circumstances, it appears unlikely that Mounds View will prevail on its claim seeking immediate replacement of the pipeline.

■ Mounds View's request for more modest relief is more difficult. Both OPS actions and an independent review of the record suggest that Williams is in violation of certain regulations. Cathodic protection of the line has been inadequate for much of the past five years. Williams' reaction to the accident—including its failure to notify fire and police officials more promptly and its problems with closing off gas backflow—was less than desirable. The issue before the court is not, however, whether Williams should be allowed to resume operations without correcting any existing safety problems. The issue is whether relatively low pressure operation, with continued OPS supervision, is so dangerous as to constitute an actionable nuisance. On the present state of the record, it appears that Mounds View is not likely to prove that Williams' violations of safety regulations are so serious that OPS–approved operation of the line at 900 p.s.i.g. is unsafe.

### b. *Ramsey County's Claims in Contract and Property*

Ramsey County argues broadly that its claims are entirely outside of HLPSA. It asserts that it gave Williams' predecessor revocable licenses to use its property and that, as a property owner, it is free to demand that its licensee abide by conditions it chooses to set. As to the portion of line that was subject to the 1957 resolution, the county also argues that HLPSA does not prohibit it, acting as property owner, from entering into a contract requiring a licensee to comply with higher safety standards.

In support of its position on preemption, Williams has relied on NGPSA cases, and particularly on *Northern Border Pipeline Co. v. Jackson County*, 512 F.Supp. 1261 (D.Minn.1981). That case held that NGPSA barred a condition on a construction permit requiring that the gas line be

buried a minimum of six feet. The county's initial efforts to distinguish *Northern Border Pipeline* were unpersuasive; it sought to distinguish agreements which predated HLPSA from those which related to the laying of new pipe. It also stressed certain language in the HLPSA definition section [31], but failed to acknowledge the existence of an identical provision in NGPSA. *See* 49 U.S.C. § 1671(4).

In its more recent brief, the county suggests a distinction of more impressive weight. Although NGPSA cases provide important aids to interpreting HLPSA, federal regulation of natural gas pipelines is substantially broader than federal regulation of hazardous liquid pipelines. While HLPSA and NGPSA are substantially similar, a larger regulatory scheme limits the ability of states and their subdivisions to control the presence of natural gas pipelines, as opposed to hazardous liquid pipelines.

The Natural Gas Act, 15 U.S.C. § 717 et seq., states that "Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary to the public interest." That statute authorizes the Department of Energy to issue certificates of public convenience and necessity and to acquire necessary property and rights-of-way by exercise of the right of eminent domain when holders of such certificates are unable to acquire them by agreement with the owner. The Alaska Natural Gas Transportation Act (ANGTA),

15 U.S.C. § 719 et seq., which was at issue in *Northern Border Pipeline*, provides even more extensive regulation of its system; the President determines the route. *Id.* at §§ 719c and 719e. *See also, FERC v. Public Service Commission*, 513 F.Supp. 653 (D.N.D.1981) (state regulation of pipeline route preempted). The Interstate Transportation of Petroleum Products Act, 15 U.S.C. § 715 et seq., on the other hand, does not provide for certificates of public convenience and necessity or the use of the right of eminent domain.[32] Under ANGTA, states cannot contest the federally-determined route of the pipeline; they have no right to prevent construction of the pipeline and therefore no right to condition it on safety-related grounds. *Northern Border Pipeline*. The instant case is substantially different, however, because Ramsey County was at no time required to give a hazardous liquid pipeline company the right to lay its line on county property.[33]

■ Although *Northern Border Pipeline* may be distinguished, Williams argument for preemption is not without merit. Hazardous liquid pipelines run through 21 states, and presumably through small and large plots of land belonging to vast numbers of persons. Were each of these landowners entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for hazardous liquid pipeline safety would be thwarted. Ramsey County's property and contract-based claims for injunctive relief

**31.** "[R]ights-of-way as used in this chapter does not authorize the Secretary to prescribe the location or the routing of any pipeline facility." 49 U.S.C. § 2001(4).

**32.** Other statutes regulate interstate pipelines carrying various products, including natural gas and hazardous liquids. See generally 49 U.S.C. § 10101 et seq. (Interstate Commerce); 30 U.S.C. § 185 (Right of way for pipelines through Federal lands).

**33.** The authority Williams provides for its interstate commerce argument also relates to natural gas pipeline system. In arguing that state interference with operation of its pipeline violates the interstate commerce clause, Williams relies on cases rejecting state or local efforts to regu-

late natural gas pipeline facilities. In all of these cases, the pipeline companies were expressly authorized to build the facilities, but states or municipalities sought to thwart these efforts. The courts held that, in light of the federal grant of certificates of convenience and necessity and of the Congressional authorization for use of the eminent domain power to the party pipeline companies, state regulation could not thwart construction of necessary gas pipeline facilities. *See Transcontinental Gas Pipe Line Corp. v. Hackensack Meadowlands Development Comm.*, 464 F.2d 1358 (3rd Cir.1972), *cert. denied* 409 U.S. 1118, 93 S.Ct. 909, 34 L.Ed.2d 701 (1973); *New York State Natural Gas Corp. v. Town of Elma*, 182 F.Supp. 1, 6 (W.D.N.Y.1960); *Transcontinental Gas Pipe Line Co. v. Milltown*, 93 F.Supp. 287 (D.N.J.1950).

appear to be "so repugnant to the statute that the survival of such rights would in effect deprive [HLPSA] of its efficacy...." *Texas Pacific Railroad Co. v. Abilene Cotton Oil Co.*, 204 U.S. at 437, 27 S.Ct. at 352. It appears that HLPSA preempts Ramsey County's claim for injunctive relief. In the litigation between Williams and Ramsey County, Williams is more likely to prevail.

### B. Irreparable Harm

██ Mounds View and Ramsey County stress the safety hazards of resuming operation of the pipeline. A tragedy has occurred, and it is understandable that citizens and local governmental authorities fear another accident if pipeline operations are resumed. Nonetheless, safety concerns must be evaluated both in the context of the alternative to pipeline operation and the evidence of the real likelihood of danger. Congress has found that "pipelines are the safest means of transporting [hazardous liquids, although] the large volumes and hazardous nature of these materials raises important safety concerns." S.Rep. 96–182, 96th Cong., 1st Sess. 2, *reprinted in*, 1979 U.S.Code Cong. & Admin.News 1972. The record shows that significant safety measures have been taken since the accident. The experts who testified at the hearing—experts called by Mounds View and Williams—agreed that the pipeline could be safely operated at 900 p.s.i.g. for at least two years. The evidence indicates that the citizens of Mounds View and Ramsey County[34] will not be irreparably harmed during the pendency of this litigation if Williams is permitted to operate its line at that pressure. The evidence did not show that operation at a higher pressure would be safe, however.

██ Williams has made a better showing of irreparable harm. Williams is, of course, concerned with its own economic losses, but the record also indicates that idling of the line is likely to cause fuel shortages. State officials have expressed concern about "serious short term supply problems." Letter of Governor Rudy Perpich to Secretary of DOT, August 19, 1986. Such shortages may result in higher prices and may also necessitate more dangerous means of transporting petroleum products, such as trucking. Williams has shown that any unnecessary delay[35] in restarting the pipeline will cause irreparable harm.

### C. Balance of Harms and Public Interest

The balance of harms and the public interest also favor an injunction barring interference with OPS–approved resumption of lower pressure pipeline operations. Williams has shown irreparable harm; the other parties have not. Denial of the preliminary injunction motions of the other parties does not mean that Williams may disregard the regulations promulgated under HLPSA. Rather, it leaves to OPS the responsibility of demanding and enforcing compliance according to the congressional scheme. The balance thus favors an injunction permitting restricted operation of the pipeline.

The public interest is more complex and more compelling. The public has at least three important interests at stake here: an interest in safety, an interest in the continued operation of petroleum pipelines, and an interest in the maintenance and enforcement of uniform federal pipeline safety standards.

The public interest in safety includes not only the prevention of hazardous operation of pipelines, but also the avoidance of hazardous liquid transportation by means more dangerous than pipelines. Here, it appears that operation of the pipeline at

---

34. Ramsey County also seeks to protect its property and contract rights. As the analysis above indicates, it appears that those rights do not permit the county to demand compliance with its safety-related instructions. Thus, those rights cannot be said to be irreparably harmed.

35. OPS has not yet authorized reopening of the line and the court anticipates that it will not do so unless and until it believes the line can be safely operated. Delay resulting from OPS efforts to ensure safety is not, of course, unnecessary.

900 p.s.i.g. will not be dangerous in the near future and that it will make less likely any resort to other carriers. The public's economic interest in the continuous operation of pipelines thus does not appear in conflict with the interest in safety. Finally, in enacting HLPSA, Congress stressed the need for uniform federal regulation of interstate pipeline safety. This interest is related both to safety and to economic and energy concerns; it is furthered by permitting OPS to exercise its statutory authority to set and enforce pipeline safety standards.

## ORDER

Accordingly, based on the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that:

1. The motion of the County of Ramsey for a preliminary injunction is denied.

2. The motion of the City of Mounds View for a preliminary injunction is denied.

3. The motion of the Williams Pipe Line Company for a preliminary injunction is granted as follows:

a. The City of Mounds View, Jerome W. Linke, Donald F. Pauley, Barbara A. Haake, Susan Hankner, Phyllis I. Blanchard, Gary C. Quick, and all their employees and agents are prohibited from hindering or interfering with recommencement of operation of the pipeline of Williams Pipe Line Company, to the extent that such operation is authorized by the United States Department of Transportation and does not exceed 900 p.s.i.g.;

b. The County of Ramsey and all its employees and agents are prohibited from hindering or interfering with recommencement of operation of the pipeline of Williams Pipe Line Company, to the extent that such operation is authorized by the United States Department of Transportation and does not exceed 900 p.s.i.g.;

4. This order shall become effective when Williams Pipe Line Company posts a bond in the amount of $100,000 and shall remain in effect until further order of the court.