**OLYMPIC PIPE LINE CO., Plaintiff,**

v.

**CITY OF SEATTLE, Defendant.**

**No. C03–2343L.**

United States District Court,
W.D. Washington,
at Seattle.

March 11, 2004.

Arthur W. Harrigan, Jr., G. Val Tollefson, Danielson Harrigan & Tollefson, Seattle, WA, for Plaintiff.

Engel E. Lee, William H. Patton, Seattle City Attorney's Office, Jerret E. Sale, Joseph John Straus, Troy D. Greenfield, Bullivant Houser Bailey, Seattle, WA, Karen Elsa Kirkpatrick, Patricia Ann Richardson, Federal Way City Attorney, Federal Way, WA, for Defendant.

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

LASNIK, District Judge.

### I. INTRODUCTION

This matter comes before the Court on a motion for summary judgment (Dkt. # 40) filed by plaintiff Olympic Pipe Line Company ("Olympic"). Defendant City of Seattle ("Seattle" or "the City") opposes the motion and requests that the Court grant summary judgment in its favor. (Response at 1). For the foregoing reasons, the Court grants Olympic's motion for summary judgment.

## II. DISCUSSION

### A. Background.

On July 16, 2003, Olympic brought this action seeking declaratory judgment as follows:

(a) That the federal Pipeline Safety Act, 49 U.S.C. §§ 60101 *et seq.*, and Washington State Pipeline Safety Act, RCW 81.88 *et seq.*, preempt defendants' attempts to control, regulate, or otherwise interfere with matters relating to the safety, design, construction, installation, testing, inspection, training, staffing, maintenance, and operations of Olympic's pipeline, and preclude enforcement of any municipal code provisions with respect to safety and other operational aspects of Olympic's pipeline.

(b) That defendants' efforts to control areas that are preempted by federal law constitute a violation of the federal and state Pipeline Safety Acts.

(c) That any termination or denial of a franchise with respect to the present interstate route of the Olympic pipeline would be in violation of the Commerce Clause.

(d) That the franchise fees sought by defendants are arbitrary and unreasonable.

(Complaint (Dkt. # 1) at 15). Olympic also seeks injunctive relief restraining Seattle from ordering the portion of the Olympic Pipeline at issue here (the "Seattle Lateral") to be shut down. *Id.* at 16.

Olympic filed this action after it received three letters from the City of Seattle. A June 27, 2003 letter from Grace Crunican, the Director of the Seattle Department of Transportation, invoked Seattle's rights under its franchise agreement with Olympic and Seattle's "police and regulatory powers" to direct Olympic to cease operation of the Seattle Lateral. *See* Talley Preliminary Injunction Decl. Ex. 5. A letter from Seattle Mayor Greg Nickels, also dated June 27, 2003, requested that Olympic conduct two inspection digs and conduct a hydrostatic test to confirm that the pipeline could be operated safely. *See* Talley Preliminary Injunction Decl. Ex. 6. The City previously had requested that Olympic undertake thirty-one specific actions to allay its concerns about the pipeline. *See* Talley Preliminary Injunction Decl. Ex. 4 (March 13, 2003 Letter from Richard Richmire, Seattle Department of Transportation Street Division Use Manager, to Olympic). Each of those requested actions concerned pipeline safety. *See id.*

On August 21, 2003, this Court issued an Order Granting Motion for Preliminary Injunction (the "Preliminary Injunction Order") (Dkt. # 31). In that Order, the Court found that Olympic was likely to prevail on the merits in this matter and that Olympic established the possibility of irreparable injury if an injunction were not issued, making issuance of a preliminary injunction appropriate. *See* Preliminary Injunction Order at 13–14. The Court enjoined "Seattle from any efforts or attempts to shut down or otherwise interfere with the operation of the Seattle Lateral until such time as the Court has ruled on the merits of Olympic's claims." *Id.* at 14. The Court also ordered Olympic to abide by the Corrective Action Order issued by the Office of Pipeline Safety and to operate the Seattle Lateral at no more than eighty percent of the maximum operating pressure during the pendency of this action. *Id.*

On November 21, 2003, Olympic brought this motion for summary judgment.

Other facts relevant to this motion are set forth in the Preliminary Injunction Order. *See id.* at 1–3.

### B. Summary Judgment Standard.

Summary judgment is proper if the moving party shows that "there is no gen-

uine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once the moving party has demonstrated the absence of a genuine issue of material fact, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.").

On a motion for summary judgment all reasonable inferences must be drawn in favor of the non-moving party. *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761 (9th Cir.1996).

## C. Preemption.

In the Preliminary Injunction Order, the Court found that Olympic was likely to prevail on its claim that Seattle's attempted regulation of the Seattle Lateral is preempted by federal law. *See* Preliminary Injunction Order at 8 ("Notwithstanding 49 U.S.C. § 60104(e), safety regulation of intrastate pipelines is expressly preempted by 49 U.S.C. § 60104(c),"). Olympic contends that "Seattle agrees that it is preempted from regulating the safety of the Seattle Lateral Pipe Line." (Reply at 1 (citing Response at 3)). Although Seattle contends that it may order Olympic

to take certain actions with respect to the Seattle Lateral for other reasons, Seattle does admit that safety regulation of interstate petroleum pipelines has been preempted by federal law since 1979. (Response at 3). Seattle also admits that the Pipeline Safety Act of 1992 limited safety regulation by state agencies (which may include municipalities) to those agencies that have been certified or authorized to do so by the Secretary of Transportation. *Id.* (citing 49 U.S.C. § 60104(c)). Seattle has not received such certification or authorization.[1] *Id.*

■ For the reasons more fully set forth in the Preliminary Injunction Order, the Court finds that Seattle is preempted by federal law from prescribing and enforcing safety standards and practices on Olympic's operation of the Seattle Lateral, whether the pipeline is considered interstate or intrastate.[2] *See* Preliminary Injunction Order at 5–10; *see also* 49 U.S.C. § 60104(c) ("A State authority that has submitted a current certification under section 60105(a) of this title may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter. A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation.").

The Court must determine whether Olympic waived the right to invoke pre-

---

1. Pursuant to an agreement between the Washington Utilities and Transportation Commission ("WUTC") and the Department of Transportation ("DOT"), the WUTC possesses authority to participate in the interstate pipeline safety program and to exercise jurisdiction over intrastate pipelines. *See* Motion for Preliminary Injunction (Dkt. # 2) Ex. 1 (WUTC–DOT Agreement) at 1.

2. Because the Court finds that Seattle's efforts to regulate Olympic's safety practices with respect to the Seattle Lateral are preempted by federal law whether the pipeline is considered interstate or intrastate, the Court need not resolve whether the pipeline is characterized as interstate or intrastate. Similarly, because Seattle's actions are preempted by federal law, the Court need not resolve whether those actions are preempted by state law.

emption and is contractually bound to follow Seattle's safety directives.

## D. Contractual Obligations.

Seattle contends that Olympic is contractually obligated to abide by the City's orders regarding reconstruction, repair, or removal of the Seattle Lateral.[3] Seattle originally granted Olympic a franchise to run the Seattle Lateral through the City in 1966, (Talley Preliminary Injunction Decl. ¶ 19). The Seattle City Council adopted the most recent franchise as Ordinance No. 116331, effective January 1, 1991.[4] *Id.* That agreement expired on December 31, 2000.

The January 1, 1991 franchise provides that Seattle's Director of Engineering may order Olympic to reconstruct, repair, or relocate the pipeline at Olympic's expense. (Richmire Preliminary Injunction Decl. Ex. C § 5). Additionally, in 1992, Olympic entered an indemnity agreement with Seattle that provided that "[u]pon notice and reasonable opportunity for consultation ... Olympic Pipe Line shall immediately comply with any reasonable request ... including ... suspension or closure of the Pipeline, when the City, in its sole discretion, deems such request or order necessary to protect human health or safety, or

the environment." (Richmire Preliminary Injunction Decl. Ex. D § 9.B).

Seattle notes that after the pipeline rupture in Bellingham, Washington, the City of Bellingham threatened to shut down the pipeline. *See* Asmundson Preliminary Injunction Decl. Ex. A (Press Release announcing 60–day Pipeline Termination Notice). Olympic and Bellingham then reached a series of interim agreements, which included safety and inspection provisions, to permit Olympic to continue to operate the pipeline. *See* Asmundson Preliminary Injunction Decl. Exs. B–D. The negotiations between Olympic and Bellingham culminated in renewal of the franchise agreement and a "special safety agreement" between the parties. *See* Asmundson Preliminary Injunction Decl. Exs. F–G.

Seattle argues that just as Olympic knew safety regulation of its pipeline was preempted, yet entered safety agreements with Bellingham after the pipeline rupture, Olympic knew or should have known that safety regulation of the Seattle Lateral by Seattle was preempted, yet voluntarily agreed in the Franchise Agreement and Indemnity Agreement to allow Seattle to exercise certain safety control over the pipeline.[5] Seattle contends that "[p]rinci-

---

3. Seattle summarizes its argument as follows: Seattle's argument focuses on the fact that Olympic voluntarily entered into both the Franchise Agreement and Indemnity Agreement with Seattle, despite Olympic's position on federal preemption, just as Olympic voluntarily entered into a franchise agreement with the City of Bellingham providing Bellingham with certain safety oversight, despite federal preemption. (Response at 8).

4. Although the ordinance had an effective date of January 1, 1991, it was passed by the Seattle City Council on September 8, 1992, and approved by the Seattle Mayor on September 11, 1992. *See* Talley Preliminary Injunction Decl. Ex. 3.

5. At oral argument the Court questioned Olympic's counsel regarding whether the agreements with Bellingham are legally enforceable. Olympic's counsel explained that the company's actions in relation to Bellingham in the aftermath of the pipeline's rupture "transcend legal obligations." Olympic has expressed its intent to abide by its promises. However, Olympic's counsel indicated that the company's agreements with Bellingham are not legally enforceable. The Court expresses no opinion regarding whether those agreements are enforceable. However, the Court notes that the facts surrounding the expired Franchise Agreement and the Indemnity Agreement are very different from those that produced the Bellingham agreements.

ples of waiver, equity and estoppel preclude Olympic from now arguing that its contractual commitment to Seattle in the form of the Indemnity Agreement is preempted by federal law." (Response at 10). Seattle cites *Legal Aid Soc'y v. City of New York*, 114 F.Supp.2d 204 (E.D.N.Y. 2000), and *Hotel Employees, Rest. Employees Union v. Marriott Corp.*, 961 F.2d 1464 (9th Cir.1992), in support of this argument.

In *Legal Aid*, the Legal Aid Society argued that a provision of a contract between it and New York City was invalid as preempted by the National Labor Relations Act ("NLRA"). *Legal Aid Soc'y v. City of New York*, 114 F.Supp.2d 204, 228 (E.D.N.Y.2000). The Court found that the contract constituted a valid waiver of the Legal Aid Society's right to challenge New York's ability to hire other lawyers to represent indigent criminal defendants. *Id.* at 229.

In *Hotel Employees*, the Marriott Corporation argued that an agreement between it and a union regarding the method by which a union would be certified to represent hotel employees was unenforceable because it fell within the primary jurisdiction of the National Labor Relations Board ("NLRB"). The court rejected the Marriott Corporation's argument, finding that the method for determining representation of the hotel employees was consistent with federal labor policy and that employers could validly waive the right to call for an NLRB election. *Hotel Employees, Rest. Employees Union v. Marriott Corp.*, 961 F.2d 1464, 1468 (9th Cir.1992).

The logic of *Legal Aid* and *Hotel Employees* does not mandate the result Seattle urges. The *Hotel Employees* Court found that an employer could waive the right to insist upon an NLRB election regarding representation of its employees. In *Legal Aid*, the court found that a union could waive certain NLRA rights by con-

tract. In contrast, this case does not involve a waiver of rights. Additionally, unlike the contracting parties in *Legal Aid* and *Hotel Employees*, here Seattle is acting not as a market participant, but rather as a regulator. This is an important distinction:

> When the State acts as a regulator, it performs a role that is characteristically a governmental rather than a private role.... Moreover, as a regulator of private conduct, the State is more powerful than private parties. These distinctions are far less significant when the State acts as a market participant with no interest in setting policy.

*Building and Constr. Trades Council v. Associated Builders*, 507 U.S. 218, 229, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). Courts have refused to permit states and municipalities from electing not to renew franchise agreements when the courts conclude that the state or municipality is using its status as a party to a contract to regulate preempted fields. *See, e.g., Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 619, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (finding that Los Angeles' attempt to condition renewal of taxi company's franchise upon resolution of collective bargaining dispute was preempted by the NLRA).

In *Williams Pipe Line Co. v. City of Mounds View*, 651 F.Supp. 551 (D.Minn. 1987), Ramsey County argued that its efforts to prevent the operation of the Williams Pipeline were not preempted because they were based upon "Williams' predecessor['s] revocable licenses to use its property, and that, as a property owner, [the county] is free to demand that its licensee abide by conditions it chooses to set." *Williams Pipe Line Co. v. City of Mounds View*, 651 F.Supp. 551, 568 (D.Minn.1987). The revocable licenses reserved to Ramsey County powers over the

pipeline similar to those contained in the Franchise Agreement and Indemnity Agreement here. *Id.* at 553. Despite Ramsey County's efforts to frame its efforts to restrict operation of the pipeline in contract and property terms, the *Mounds View* Court found its attempt to prevent operation of the pipeline likely to be preempted:[6]

> Hazardous liquid pipelines run through 21 states, and presumably through small and large plots of land belonging to vast numbers of persons. Were each of these landowners entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for hazardous liquid pipeline safety would be thwarted. Ramsey County's property and contract-based claims for injunctive relief appear to be "so repugnant to the statute that survival of such rights would in effect deprive [HLPSA] of its efficacy." ... [Therefore] [i]t appears that HLPSA preempts Ramsey County's claim for injunctive relief.

*Id.* at 569–70 (internal citation omitted).

Seattle attempts to distinguish *Mounds View* by noting that "the court did not discuss the market participant doctrine." (Response at 18). Seattle is correct that the *Mounds View* Court did not invoke the market participant doctrine when determining that Ramsey County could not rely upon its licenses and property ownership to compel Williams to abide by its conditions. However, the *Mounds View* Court appears to have considered this question from the perspective of Ramsey County as a property owner, rather than safety regulator. *See Mounds View* at 568. This only heightens the importance of that court's observation that were individual "landowners entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for hazardous liquid pipeline safety would be thwarted." *Id.* at 569.

Additionally, the Court finds that Seattle is not acting as a market participant, but rather as a regulator. Seattle attempts to explain the fact that it specifically invoked its regulatory authority by reference to procedural restrictions for the authorization for relief from the automatic bankruptcy stay under 11 U.S.C. § 362(b)(4). *See* Response at 12; *see also* Talley Preliminary Injunction Decl. Ex. 5 (Letter from Seattle Department of Transportation Director to Olympic) ("[T]he City hereby exercises its police and regulatory powers."); Talley Preliminary Injunction Decl. Ex. 6 (Letter from Seattle Mayor Greg Nickels to Olympic) ("It is the duty of the City, on behalf of the general public and especially for those who reside near the pipeline, to have confidence that the pipeline is safe and that the operator will meet all safety and operating obligations."). Additionally, Seattle argues that *Shell Oil Co. v. City of Santa Monica,* 830 F.2d 1052 (9th Cir.1987), supports the argument that it is acting as a market participant rather than as a regulator. *See* Response at 16–18.

In *Shell Oil,* the court considered whether Santa Monica was a market participant for dormant commerce clause analysis. Shell argued that Santa Monica violated

---

**6.** This question was not definitively determined because it was presented in the context of Williams' motion for preliminary injunction. Ramsey County later "retreated from its initial claims" and sought not to prevent Williams from taking action on the pipeline, but " 'merely [sought] the authority to order Williams to relocate its pipe when the dictates of road construction or road safety so require.' " *Williams Pipe Line Co. v. City of Mounds View,* 704 F.Supp. 914, 919 (D.Minn. 1989). The court dismissed Ramsey County's claims without prejudice for lack of an "actual controversy [and] concrete factual setting." *Id.*

the commerce cause by requesting an annual fee of approximately one-quarter million dollars for Shell's use of the city's rights of way beneath city streets.[7] *Shell Oil Co. v. City of Santa Monica,* 830 F.2d 1052, 1056 (9th Cir.1987). Santa Monica argued that by virtue of holding easements in the area beneath city streets, it "competes with other entities that also might supply Shell's needs-private landowners in Santa Monica who may sell easements under their land, neighboring municipalities and private landowners, and tank truck and barge operators." *Id.* at 1057. The court acknowledged the "considerable intuitive appeal" of Santa Monica's market argument, but rejected it on the basis of *Western Oil & Gas Ass'n v. Cory,* 726 F.2d 1340 (9th Cir.1984). The court observed that Santa Monica had a weaker competitive advantage (and therefore stronger argument that it should be found to be a market participant) than that present in *Cory.* "However, like *Cory,* this case involves lands held in a sovereign capacity that are recognized transportation corridors for commerce." *Id.* The court therefore concluded that Santa Monica was not a market participant in setting franchise fees for easements beneath public streets. *Id.* at 1057–58. The court specifically "observe[d] that this case involves only substreet easements controlled by the city in its sovereign capacity" and therefore the court had "no occasion to decide what restrictions, if any, the dormant commerce clause may place on the sale of property interests in land purchased or acquired by the city through its entry into the real estate market." *Id.* at 1058 n. 5.

Seattle emphasizes that it holds property in fee, some of which is used by Olympic for the Seattle Lateral. *See* Response at 15, 18 (citing Hallauer Decl. ¶¶ 2–3, Ex. A;

Lee Decl. Exs. I–J). Seattle contends that because it holds the land at issue here in fee, rather than merely holding easement interests as did Santa Monica in *Shell Oil,* it should be considered a market participant. Seattle has submitted evidence that portions of the Olympic Pipeline (which appear not to be that section of the Seattle Lateral at issue here) are "owned by the City of Seattle [in fee], but ... are located outside of the Seattle city limits." (Hallauer Decl. ¶ 3; *see also* Hallauer Decl. Ex. A ("Liquid Petroleum Product Pipeline Permit Agreement (Water Pipeline Crossings)")).

Seattle has purchased fee interests in certain land outside of the city limits. Seattle also represents that it "owns large portions of plaintiff's pipeline corridor in fee." (Response at 18). However, whether the property is owned in fee or whether the City merely holds easement interests in the property does not carry the same importance as does the capacity by which Seattle holds the land. *Shell Oil* "involve[d] only substreet easements controlled by the city in its *sovereign capacity.*" *Shell Oil,* 830 F.2d at 1058 n. 5 (emphasis added). Additionally, *Shell* "involve[d] lands held in a sovereign capacity that are recognized transportation corridors for commerce." *Id.* at 1057. Here the Seattle Lateral runs "in, under, along and across certain streets, avenues, alleys and public places in the City of Seattle." (Talley Preliminary Injunction Decl. Ex. 3). Those "streets, avenues, alleys and public places" are owned by Seattle in its sovereign capacity. This is not a case in which, for example, Seattle purchased an office building and, as a participant in the real estate market, leases building space to private organizations. Like the interests in *Shell*

---

7. Santa Monica did not hold a fee interest in the streets, but rather held easements In the streets for street purposes. *Shell Oil Co. v.* *City of Santa Monica,* 830 F.2d 1052, 1054 (9th Cir.1987).

and *Cory*, the land beneath which the Seattle Lateral runs is owned by Seattle for purposes of maintaining a surface transportation system in the city. Under these circumstances, the Court cannot find that Seattle is acting as a market participant in its dealings with Olympic. Because Seattle's attempts to impose safety conditions upon the continued operation of the Seattle Lateral are taken "as a regulator of private conduct [rather than] as a market participant," those actions are preempted notwithstanding the provisions of the Franchise Agreement and Indemnity Agreement. *Associated Builders*, 507 U.S. at 229, 113 S.Ct. 1190.

The Court emphasizes that this narrow finding does not mean that Seattle is precluded from taking any actions that might affect the continued use and presence of the pipeline in Seattle. For example, Seattle's demand that Olympic provide liability insurance coverage for loss from the pipeline (a demand with which Olympic appears to have complied) would not likely be considered safety regulation that is preempted by federal law. That and other demands that Seattle might assert are not presently in controversy.[8] However, there exists an overarching need for consistency and a high degree of uniformity in the safety regulation of petroleum pipelines. Congress has recognized that need in the Pipeline Safety Act. For this reason the Court finds that safety regulation of the Seattle Lateral, such as the demands set forth in the March 13, 2003 letter from Seattle to Olympic, is preempted by federal law, and Olympic is entitled to declaratory judgment to that effect.

**E.   Other Arguments.**

Seattle states that it "incorporates its previous arguments regarding safety information in the form of a hydrostatic test, and regarding the collateral estoppel effect of the Bankruptcy Court order by reference to the pleadings that the Court already has before it." (Response at 9). Both of these arguments are meritless.

■   Seattle demands that Olympic's "Baseline Assessment Plan (BAP) include a ten year long-range plan for the Seattle Lateral, which incorporates Non Destructive Testing (TFI, MFL, Ultrasonic or equal) and Hydrotesting." (Talley Preliminary Injunction Decl. Ex. 4 at 2). This is not a mere request for information, but rather safety regulation that is preempted by 49 U.S.C. § 60104(c).

The issues present here were not fully litigated in the bankruptcy proceedings or resolved by the Bankruptcy Court's order regarding relief from the automatic stay. Collateral estoppel therefore does not bar Olympic from bringing this action. *See* Preliminary Injunction Order at 4–5.

**III.   CONCLUSION**

For the foregoing reasons, the Court GRANTS Olympic's motion for summary judgment (Dkt. # 40) as follows. The Court DECLARES that the Pipeline Safety Act preempts Seattle's attempts to control or regulate the safety and inspection of the Seattle Lateral and that Seattle's efforts to control areas preempted by the Pipeline Safety Act constitute a violation of that law. *See* Complaint at 15 ¶¶ a-b.

---

**8.**   The Court cannot find "that *any* termination or denial of a franchise with respect to the present interstate route of the Olympic pipeline would be in violation of the Commerce Clause." (Complaint at 15 (emphasis added)). Such termination or denial on the basis of Olympic's refusal to comply with Seattle's safety demands would be impermissible. Se-

attle may be permitted to terminate or deny the franchise for other reasons, but that issue is not before the Court.

Olympic has made no showing that the franchise fees sought by Seattle are unreasonable. *See id.* (seeking declaratory judgment "[t]hat the franchise fees sought by defendants are arbitrary or unreasonable").

The Court DECLARES that termination or denial of a franchise for the interstate portion of Olympic's pipeline based upon Olympic's refusal to comply with Seattle's preempted safety demands violates the Commerce Clause. *See id.* ¶ c. However, the Court DENIES Olympic's request for a declaration that "any" termination or denial of a franchise violates the Commerce Clause. *See id.* ¶ c. The Court also DENIES Olympic's request for a declaration that the franchise fees sought by Seattle are arbitrary and unreasonable. *See id.* ¶ d. Seattle is ENJOINED from ordering Olympic to undertake particular inspections or to implement particular safety measures on the Seattle Lateral. The Court directs the Clerk of the Court to enter judgment in favor of Olympic and against Seattle.[9] The Clerk of the Court is also directed to send copies of this Order to all counsel of record.

---

9. Olympic states that because Seattle's response "presages potential disputes on preemption issues if and when the parties engage in substantive franchise negotiations, it may be wise for the Court to retain jurisdiction of this matter pending a completed franchise agreement." (Reply at 8). Disputes between the parties may arise regarding a franchise fee or other issues. However, because such potential disputes do not yet present an actual controversy, the Court finds entry of judgment on this matter to be appropriate.