**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OLYMPIC PIPE LINE COMPANY, a
Delaware corporation,
*Plaintiff-Appellee,*

v.

CITY OF SEATTLE, a Washington
municipal corporation,
*Defendant-Appellant.*

No. 04-35307

D.C. No.
CV-03-02343-RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted
June 14, 2005—Seattle, Washington

Filed February 8, 2006

Before: Harry Pregerson, Susan P. Graber, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

## COUNSEL

William H. Patton, City of Seattle, Seattle, Washington, for the defendant-appellant.

G. Val Tollefson and Katherine Kennedy, Danielson Harrigan Leyh & Tollefson LLP, Seattle, Washington, for the plaintiff-appellee.

Kevin Hawley, Lima, Ohio, for the amicus.

## OPINION

GOULD, Circuit Judge:

We must decide whether the City of Seattle ("Seattle" or "the City") can enforce specific provisions of two contracts it has with the Olympic Pipe Line Company ("Olympic") to provide safety oversight of a hazardous liquid pipeline within Seattle's city boundaries, despite the apparent federal preemption of hazardous liquid pipeline safety regulation by the Pipeline Safety Improvement Act of 2002, 49 U.S.C. § 60101 *et seq.* ("PSA").

After a section of Olympic's hazardous liquid pipeline exploded in Bellingham, Washington, killing three people and causing extensive environmental damage, Seattle declined to renew Olympic's franchise for the section of pipeline within the city limits until Olympic complied with the City's list of pipeline safety demands.[1] If Olympic failed to comply, the

---

[1]These demands included the completion of a hydrostatic test. A hydrostatic test involves purging all natural gas or petroleum out of the pipeline, cleaning the inside of the pipeline, filling it with water and then pressurizing the pipeline to a pressure higher than the normal operating pressure. *See* Office of Pipeline Safety, Pipeline Fact Sheet, *at* http://primis.phmsa.dot.gov/comm/FactSheets/FSHydrostaticTesting.htm (last visited Jan. 31, 2006).

City said it would shut down the operation of Olympic's pipeline within Seattle's city limits. Declining to comply with Seattle's demands, Olympic filed suit for injunctive and declaratory relief, asserting that, even though the franchise agreement between Seattle and Olympic arguably included safety oversight provisions, Seattle's attempt to impose safety regulations pursuant to those provisions was preempted by the PSA. The district court granted Olympic's motion for a preliminary injunction, halting Seattle's effort to shut down Olympic's pipeline. The district court then granted summary judgment in favor of Olympic, determining that Seattle's regulatory efforts were preempted by the PSA.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I

The Olympic Pipe Line Company operates a 400-mile pipeline system spanning parts of Washington and Oregon. Olympic's main pipeline is a 299-mile conduit beginning about fifteen miles from the Washington-Canada border, at a refinery near Ferndale, Washington, and running southward to its terminus in Portland, Oregon. Lateral delivery lines carry petroleum products from the main pipeline to bulk terminals at Seattle, Seattle-Tacoma International Airport, Tacoma, Olympia, and Vancouver, Washington, as well as Linnton and Portland, Oregon. The lateral pipeline at the center of this dispute is Olympic's Seattle Lateral Line ("Seattle Lateral"), which branches from Olympic's main pipeline in Renton, Washington, travels through the cities of Renton, Federal Way, and Seattle, and ends at the commercial shipping terminals on Harbor Island.[2] Seven miles of the twelve-mile long

---

[2]The Harbor Island terminus is a distribution point for non-pipeline petroleum transportation, like tanker trucks and barges. About eighty percent of the product shipped in the Seattle Lateral is gasoline, but the pipeline also carries jet fuel for use at Boeing Field and high sulfur fuel for use by the Washington State Ferries. The majority of the petroleum product shipped through the Seattle Lateral is petroleum refined in the State of Washington, but the pipeline also carries petroleum products refined in other states.

Seattle Lateral are located in the City of Seattle.[3] This section of the Seattle Lateral runs by elementary schools and a residential neighborhood, underneath Interstate 5, and next to electricity transmission lines.

Seattle originally granted Olympic a franchise to operate its pipeline within Seattle city limits in 1966. The Seattle City Council adopted the most recent franchise agreement between the parties, effective January 1, 1991, as Seattle City Ordinance 116331 ("Franchise Agreement").[4] The Franchise Agreement permitted Olympic to maintain and operate its pipeline under and along certain Seattle public streets and rights-of-way for a ten-year term, with the possibility for two additional ten-year renewals. Seattle conditioned Olympic's franchise on the execution of an Indemnity Agreement, ensuring the City that Olympic's pipeline would "not result in the City incurring any liability, environmental or otherwise, as a result of Olympic Pipe Line's Pipeline or operations pursuant to the Permit."

On June 10, 1999, a section of Olympic's main pipeline exploded near Whatcom Creek in Bellingham, Washington, spilling approximately 230,000 gallons of unleaded gasoline, killing three people, and causing millions of dollars of property and ecological damage. The accident caused Olympic to shut down the northern half of its pipeline until February 2001; to spend millions of dollars to remediate the environmental damage caused by the accident; and to repair, inspect, and upgrade its pipeline. Relevant to Seattle's demands, after the 1999 rupture Olympic entered into several agreements

---

[3]As a consequence of this sensitive geography, the section of the Seattle Lateral inside Seattle has been designated a "high consequence area" under the applicable federal regulations. *See* 49 C.F.R. § 195.452, 49 C.F.R. pt. 195, app. C.

[4]Although the effective date of the ordinance was January 1, 1991, the Seattle City Council passed the ordinance on September 8, 1992, and the Seattle Mayor approved it on September 11, 1992.

with the City of Bellingham, which included giving some safety oversight powers to Bellingham and agreeing to perform a hydrostatic test of the pipeline. Olympic also conducted hydrostatic tests on three sections of its pipeline located in the cities of Bellingham, Woodinville, and Renton. During each hydrostatic test, a portion of the tested pipeline failed along a longitudinal seam.

Seattle did not automatically renew Olympic's franchise for the Seattle Lateral upon its December 31, 2000, expiration. Instead, Seattle first sought information from Olympic and the applicable regulating state and federal agencies regarding pipeline safety. The City then hired a consultant, SECOR International, Inc. ("SECOR"), to investigate possible pipeline integrity issues. SECOR's investigation culminated in Seattle's requesting that Olympic respond to thirty-three safety concerns before the City would determine whether it would agree to a new franchise agreement. Among the listed items, Seattle requested that Olympic complete a hydrostatic test of the Seattle Lateral. Olympic refused to perform the test.

Seattle responded with two letters, one from the Director of Transportation and one from the Mayor. The Transportation Director's letter notified Olympic that Seattle was suspending all pipeline operations no later than sixty days from the letter's date until the parties agreed upon a new franchise agreement, and that Olympic's failure to comply would subject the company to criminal sanctions. The Mayor's letter notified Olympic that, because of Olympic's bankruptcy[5] and the

---

[5]On March 27, 2003, Olympic filed a Chapter 11 bankruptcy proceeding, *In re Olympic Pipe Line Co.*, No. 03-14059, in the United States Bankruptcy Court for the Western District of Washington. On April 8, 2003, Seattle filed a motion for relief from the automatic bankruptcy stay, arguing that relief was appropriate under the "for cause" provision of 11 U.S.C. § 362(d)(1). The "cause" alleged was Olympic's purported failure to provide the City proof of adequate insurance coverage. The bankruptcy judge denied Seattle's motion, holding that Seattle was a governmental unit for purposes of 11 U.S.C. § 362(b)(4), and its use of police power with regard to the Seattle Lateral was not automatically stayed by Olympic's bankruptcy filing.

refusal of Olympic's corporate parent[6] to provide a corporate guarantee, Seattle would not grant a new franchise agreement until a solvent Olympic or its successor company emerged from bankruptcy. The Mayor's letter also stated that as of August 26, 2003, he would suspend Olympic's operation of the Seattle Lateral; however, he would rescind that order if Olympic could prove the pipeline was safe by performing a hydrostatic test of the pipeline and two inspection digs within sixty days, or before Seattle schools returned to session. Mayor Nickels asked for a response indicating Olympic's intentions by July 11, 2003.[7]

Instead of responding, on July 16, 2003, Olympic filed this action against Seattle[8] for injunctive relief restraining the City from ordering Olympic to shut down the Seattle Lateral and a declaratory judgment that: (1) the PSA preempts Seattle's attempts to control, regulate, or otherwise interfere with matters relating to the safety, design, construction, testing, or operation of Olympic's pipeline; (2) the termination or denial of Olympic's franchise would be a violation of the Commerce Clause; and (3) the franchise fees sought by Seattle were arbitrary and unreasonable. *See Olympic Pipe Line Co. v. City of Seattle*, 316 F. Supp. 2d 900, 901 (W.D. Wash. 2004). On August 21, 2003, the district court granted Olympic's motion for a preliminary injunction, enjoining Seattle from closing down the Seattle Lateral.[9] *Id.*

---

[6]Olympic is owned by ARCO MidCon and Shell Pipeline Company LP.

[7]On July 9, 2003, the Office of Pipeline Safety ("OPS") of the Department of Transportation ("DOT") notified Seattle that its position was that a hydrostatic test of the Seattle Lateral was not necessary to ensure the safe operation of the pipeline and that the pipeline met federal regulatory standards.

[8]The City of Federal Way was also named as a defendant but was later dismissed without prejudice.

[9]The court also granted Olympic's motion to remove the automatic reference of the matter to the bankruptcy court.

The parties then both moved for summary judgment. The district court granted Olympic's motion in part, declaring that the PSA preempted the City's attempts to regulate the safety and inspection of the Seattle Lateral. *Id.* at 902-03. Contrary to Seattle's claims, the district court held that Olympic did not "waive" its ability to claim federal preemption. *Id.* at 904-05. The court also concluded that the City's actions were preempted because, in attempting to enforce the safety provisions of its contract, Seattle was acting in its regulatory rather than proprietary capacity. *Id.* at 905-06. Finally, the court noted that its determination did not preclude Seattle from taking other actions possibly affecting Olympic's continued operation of the pipeline.[10] *Id.* at 907 & n.8. The court enjoined Seattle from ordering Olympic to undertake particular inspections or implement particular safety measures on the Seattle Lateral. Seattle timely appealed.[11]

On appeal, Seattle argues that its attempt at safety regulation is not preempted by the PSA because the PSA does not "fill the field" of pipeline safety regulation. Seattle also asserts that, even if the PSA does preempt the City's actions, Olympic waived its right to raise preemption as a defense when the company entered into the Franchise Agreement and

[10]For example, the court did not consider Seattle's demand that Olympic provide liability insurance to be a safety demand that was preempted by federal law. The court also denied Olympic's request for a declaration that "any" termination or denial of a franchise violated the Commerce Clause, and that the franchise fees sought by Seattle were arbitrary and unreasonable. Those issues were not appealed.

[11]We review de novo a district court's grant of summary judgment. *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.,* 397 F.3d 1217, 1226 n.8 (9th Cir. 2005). Viewing the facts in the light most favorable to the nonmoving party, we must determine whether a genuine issue of material fact exists, and whether the district court applied the law correctly. *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004). Olympic argues that, because a preliminary injunction was granted in this case, our review of that ruling is for abuse of discretion. Olympic is incorrect. The final judgment appealed is the summary judgment order. There was no interlocutory appeal of the injunction.

the Indemnity Agreement. Finally, the City contends that public policy requires that the agreements be enforced.

We turn first to the question of federal preemption: whether the PSA preempts a municipality's attempt to impose safety standards on a hazardous liquid pipeline.[12]

## II

**[1]** The Supremacy Clause of Article VI of the United States Constitution grants Congress the power to preempt state or local law. U.S. Const. art. VI, § 2; *AGG Enters.*, 281 F.3d at 1327. Under the doctrine of preemption, a federal law can displace state law through express preemption, field preemption, or conflict preemption.[13] *See*, *e.g.*, *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299-300 (1988); *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280-81 (1987). To determine whether the PSA preempts Seattle's action, we begin with the statutory text. *See Schneidewind*, 485 U.S. at 299.

---

[12]We review de novo a district court's decision regarding preemption. *AGG Enters. v. Wash. County*, 281 F.3d 1324, 1327 (9th Cir. 2002). We also review de novo a district court's interpretation of federal statutes, including the PSA. *Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1055-56 (9th Cir. 1987).

[13]Express preemption exists where Congress enacts an explicit statutory demand that state law be displaced. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). Field preemption exists "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." *Moldo v. Matsco, Inc. (In re Cybernetic Servs., Inc.)*, 252 F.3d 1039, 1045-46 (9th Cir. 2001) (internal quotation marks omitted). Conflict preemption is found "where compliance with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

## A

[2] The purpose of the PSA is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation."[14] 49 U.S.C. § 60102(a)(1). Federal legislation seeks to provide "a national hazardous liquid pipeline safety program with nationally uniform minimal standards and with enforcement administered through a Federal-State partnership." 49 C.F.R. pt. 195, app. A.

[3] The PSA differentiates between the regulation of interstate[15] and intrastate[16] hazardous liquid pipelines.[17] For interstate pipelines, state and local authorities generally "may not adopt or continue in force safety standards for interstate pipe-

---

[14]Before the enactment of the PSA in 1992, two separate statutes provided the framework for the regulation of pipeline safety. The Natural Gas Pipeline Safety Act of 1968 ("NGPSA") authorized the DOT to regulate pipeline transportation of natural gas and other gases as well as the transportation and storage of liquefied natural gas. Pub. L. No. 90-481, 82 Stat. 1003 (1968) (formerly 49 U.S.C. § 1671 *et seq.*). The Hazardous Liquid Pipeline Safety Act of 1979 ("HLPSA"), Pub. L. No. 96-129, 93 Stat. 1003 (1979) (formerly 49 U.S.C. §§ 2001-2014), was modeled largely on the NGPSA, and authorized the DOT to regulate pipeline transportation of hazardous liquids. The PSA combined and recodified the two existing pipeline safety statutes at 49 U.S.C. § 60101 *et seq.*

[15]An "interstate hazardous liquid pipeline facility" is "a hazardous liquid pipeline facility used to transport hazardous liquid in interstate or foreign commerce." 49 U.S.C. § 60101(a)(7). "Interstate or foreign commerce" is defined in relevant part as commerce between "a place in a State and a place outside that State" or "places in the same State through a place outside the State." *Id.* § 60101(a)(8)(B).

[16]An "intrastate hazardous liquid pipeline facility" is "a hazardous liquid pipeline facility that is not an interstate hazardous liquid pipeline facility." *Id.* § 60101(a)(10).

[17]A "hazardous liquid pipeline facility" is a "pipeline, a right of way, a facility, a building, or equipment used or intended to be used in transporting hazardous liquid." *Id.* § 60101(a)(5).

line facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c) (provision entitled "Preemption"). There are two exceptions to this prohibition. First, a state authority may enter into a pipeline safety agreement with the DOT, through which the DOT authorizes the state authority to participate in the oversight of interstate pipeline facilities. *Id.* § 60106(a). Second, the DOT may designate an agent with delegated authority to conduct inspections of pipeline operators and facilities to ensure compliance with federal safety standards on behalf of the DOT. *Id.* § 60117(c). Thus, a state authority may not impose safety requirements on an interstate hazardous liquid pipeline unless the DOT has delegated authority to the state entity under § 60106(a) or § 60117(c). Federal preemption of the regulation of interstate pipeline safety in any other manner is manifest in the language of the PSA provision entitled "Preemption." *See id.* § 60104(c).[18]

[4] Regarding intrastate pipelines, the PSA provides:

> A State authority that has submitted a current certification under section 60105(a) of this title may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter.

*Id.* § 60104(c). Thus, a state authority may regulate intrastate pipelines and impose safety requirements in addition to the federal standards only if: 1) the state authority applies and is approved by the DOT through an annual certification process pursuant to § 60105; and 2) the standards are compatible with the federal standards. *Id.* § 60104(c). Alternatively, a state

---

[18]The DOT's regulations also so conclude: "The HLPSA leaves to exclusive Federal regulation and enforcement the 'interstate pipeline facilities,' those used for the pipeline transportation of hazardous liquids in interstate or foreign commerce." 49 C.F.R. pt. 195, app. A.

authority may receive authorization from the DOT to regulate an intrastate pipeline under a pipeline safety agreement pursuant to § 60106(a) or through the designation of an agent under § 60117(c).

The Washington Utilities and Transportation Commission ("WUTC") is the regulating state authority for pipelines in the State of Washington. After the 1999 Bellingham accident, the Washington state legislature passed its own Pipeline Safety Act, Wash. Rev. Code §§ 81.88.005-81.88.902, in an effort to protect the health and safety of Washington's citizens and the state's environment. Wash. Rev. Code § 81.88.005(1). The Act placed the state's hazardous liquid pipeline safety authority and responsibility with the WUTC and required the commission to apply for federal delegation for the state's program to enforce the federal hazardous liquid pipeline safety requirements. Wash. Rev. Code §§ 81.88.060, 81.88.090.

The WUTC entered into an agreement with the DOT, the "Interstate Pipeline Transportation Agreement" ("WUTC-DOT Agreement"), which delegated to the WUTC the authority, under 49 U.S.C. § 60117(c), to "participate in the interstate pipeline safety program, with the Office of Pipeline Safety (OPS), to ensure compliance with the Federal safety standards." The WUTC-DOT Agreement also provided WUTC with jurisdiction, pursuant to the certification provision of 49 U.S.C. § 60105(a), over all intrastate operators subject to the PSA. Through this statutory delegation and certification, the agreement granted the WUTC the authority to address and oversee a wide variety of pipeline issues, including incident investigation, safety monitoring, inspections, and reporting, as the DOT's agent.[19]

---

[19]The WUTC has promulgated its own regulations, Wash. Admin. Code 480-75 *et seq.*, covering pipeline design, construction, repair, operation, maintenance, and reporting, that meet or exceed the federal regulations promulgated by DOT; the WUTC regulations expressly adopt DOT's regulations by reference. Wash. Admin. Code 480-75-999 (adopting 49 C.F.R., Parts 195 and 199, including all appendices and amendments).

**[5]** Seattle contends that the provisions of the Franchise Agreement and the Indemnity Agreement that impose safety standards on Olympic are not preempted by the PSA.[20] We disagree. Assuming arguendo that municipalities can seek agreements under § 60105(a) and § 60106(a) as they relate to *hazardous liquid* pipelines,[21] Seattle did not seek any such agreement. Further, the City has not been delegated authority by DOT to conduct inspections of pipeline operators and facilities pursuant to § 60117(c). Rather, the DOT delegated this authority to the WUTC through the WUTC-DOT Agree-

---

[20]The agreements include two provisions that address safety concerns. The Franchise Agreement provides:

> Section 5. The Permittee shall not construct, reconstruct, relocate, readjust or repair the pipeline system except under the supervision, and in strict accordance with plans and specifications, approved by the Director before any work or repair is commenced. The Director in his or her judgment may order such reconstruction, relocation, readjustment or repair of the pipeline system at the Permittee's own cost and expense because of the deterioration or unsafe condition of the pipeline system, grade separations, or the installation, construction, reconstruction, maintenance, operation or repair of any and all municipally owned public utilities, or for any other cause.

The Indemnity Agreement states:

> 7. *Monitoring and Notification of Releases*: In addition to any other monitoring and reporting requirements that are required by law or prudent under the circumstances, Olympic Pipe Line shall monitor the Pipeline by making weekly visual inspections and annual pressure tests. . . .

[21]The PSA provides that a municipality may be certified pursuant to § 60105(a), or enter into a pipeline safety agreement with the DOT under § 60106(a), if the certification or agreement applies to intrastate gas pipeline transportation. 49 U.S.C. §§ 60105(a), 60106(a). Hazardous liquids, however, are distinct from gases under the PSA. *Id.* §§ 60101(a)(4) (defining "hazardous liquid" as "petroleum or a petroleum product" or a substance that the DOT determines "may pose an unreasonable risk to life or property when transported by a hazardous liquid pipeline facility in a liquid state (except for liquefied natural gas)"), 60101(a)(2) (defining "gas" as "natural gas, flammable gas, or toxic or corrosive gas").

ment.[22] We conclude, therefore, that the PSA expressly pre-empts the City's attempt to impose safety regulations on the Seattle Lateral.[23]

**B**

Our precedent supports this result. In *Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052 (9th Cir. 1987), we held that the HLPSA did not preempt Santa Monica from imposing safety standards in a franchise agreement with Shell Oil's pre-decessor to operate an oil pipeline within city limits. *Id.* at 1063, 1066. We first noted that the HLPSA "expressly pre-empts states from imposing any additional safety standards on *inter*state pipelines." *Id.* at 1063. The HLPSA, however, expressly permitted additional state regulation of intrastate pipelines by "[a]ny State agency." *Id.* at 1064 (relying on the text of former 49 U.S.C. § 2002(d) ("Any State agency may adopt additional or more stringent safety standards for intra-state pipeline facilities and the transportation of hazardous liq-uids associated with such facilities, if such standards are compatible with the Federal standards issued under this chap-ter.")) (emphasis omitted). For purposes of summary judg-ment, we assumed that the pipeline at issue was an intrastate pipeline. *Id.* at 1064 n.12. We then determined that the HLPSA did not expressly preempt the City's imposition of

---

[22]We do not address or decide the extent to which the City of Seattle may permissibly participate in the WUTC's regulatory oversight. In any event, the City surely has some opportunity to gain consideration of its views through the state agency's processes.

[23]Because we conclude that the City's actions are preempted if the pipe-line is either an interstate or an intrastate pipeline, we need not decide whether the Seattle Lateral segment of the pipeline system should be con-sidered under the PSA as an interstate or intrastate pipeline. Also, Seattle argues that the PSA does not "fill the field" of pipeline safety regulation, and therefore the City's actions are not preempted. We conclude that the PSA expressly preempts Seattle's efforts to impose pipeline safety regula-tions on Olympic's operation of the Seattle Lateral, and therefore we do not reach the question of field preemption.

safety standards because the term "State agency" could include a municipality like Santa Monica. *Id.* at 1065-66 ("If Congress had intended to limit [the term 'State agency'] to state agencies that are certified under § 2004(a), one would have expected it to have done so expressly.").

When the HLPSA was recodified as part of the PSA in 1992, Congress changed the term "[a]ny State agency" to "[a] state authority that has submitted a current certification under section 60105(a) of this title." 49 U.S.C. § 60104(c); *see also* H.R. Rep. No. 102—247(II) (1992) ("Section 203(d) of the [HLPSA] is further amended by inserting 'that has submitted a current certification under section 205(a)' after 'Any State agency.' "). Congress now has declared its intent to limit "any State agency" to certified agencies. *See Shell Oil,* 830 F.2d at 1065. Thus, our conclusion that the PSA preempts Seattle's attempt to impose safety measures on Olympic's operation of the Seattle Lateral is consistent with and supported by our precedent in *Shell Oil.*[24]

## C

[6] Although the PSA expressly preempts Seattle's attempted safety regulation of the Seattle Lateral, the City

---

[24]Extra-circuit cases analyzing preemption under the HLPSA and the NGPSA support our conclusion. *See*, *e.g.*, *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354, 358 (8th Cir. 1993) (holding that the HLPSA expressly preempts an Iowa state statute that established a state program to supervise interstate hazardous liquid pipelines); *Natural Gas Pipeline Co. of Am. v. R.R. Comm'n*, 679 F.2d 51, 52 (5th Cir. 1982) (holding that the NGPSA expressly preempts the application to interstate gas pipelines of a Texas Railroad Commission rule requiring natural gas companies to provide procedures and safeguards to protect the public from accidental releases of gases from their facilities); *Williams Pipe Line Co. v. City of Mounds View*, 651 F. Supp. 551, 566 (D. Minn. 1987) (holding that the HLPSA expressly preempts city and county efforts to regulate hazardous liquid pipeline safety because the Act "clearly expresses Congressional intent to preempt state efforts to establish safety standards for hazardous liquid pipelines").

may still contractually require that Olympic perform safety tests of the pipeline if, in entering into the Franchise Agreement, the City acted as a municipal proprietor rather than as a regulator. *Bldg. & Constr. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 227, 229 (1993); *Associated Gen. Contractors of Am. v. Metro. Water Dist.*, 159 F.3d 1178, 1182-83 (9th Cir. 1998); *see also Shell Oil*, 830 F.2d at 1062. To determine whether a government entity is acting in a proprietary or a regulatory capacity, we consider whether "the challenged action essentially reflect[s] the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances" and whether "the narrow scope of the challenged action defeat[s] an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem." *Aeroground, Inc. v. City & County of San Francisco*, 170 F. Supp. 2d 950, 957 (N.D. Cal. 2001) (quoting *Cardinal Towing & Auto Repair, Inc. v. City of Bedford*, 180 F.3d 686, 693 (5th Cir. 1999)).

**[7]** The district court correctly concluded that, in requiring Olympic to comply with certain safety demands, Seattle was acting as a regulator rather than as a municipal proprietor. *Olympic Pipe Line*, 316 F. Supp. 2d at 906-07. The City's interest is not that of a private market participant that owns a pipeline or competes in the pipeline market or a related market. Rather, Seattle in its sovereign capacity owns the streets and land under which the Seattle Lateral runs, for the purpose of maintaining a transportation system. *See Shell Oil*, 830 F.2d at 1057-58 (holding that the City of Santa Monica is not a market participant in the setting of franchise fees for purposes of the dormant Commerce Clause because the City holds the streets, under which the pipeline runs, in its sovereign capacity). Also, Seattle made the safety demands on Olympic in an effort to prevent a pipeline accident in Seattle similar to the 1999 Bellingham accident; the City thus acted pursuant to its general duty to protect the public health and

safety — a duty grounded in the City's regulatory, police power — rather than in an attempt to protect its role in the real estate market.[25] Finally, in its letters to Olympic requiring compliance with the City's safety demands, Seattle repeatedly invoked its police and regulatory powers.[26] For example, in a June 27, 2003 letter to Olympic's President, Seattle's Transportation Director stated: "the City hereby exercises its police and regulatory powers and orders Olympic to cease all operation of the Seattle Lateral Line under the earliest possible timeline . . . ." Further, in a June 27, 2003 letter from Seattle's Mayor to Olympic's President, the Mayor noted: "I do not consider [Olympic's] response acceptable to the public safety needs of Seattle residents." Because Seattle was acting as a regulator when it imposed safety standards on Olympic, the City's actions do not fall within the market proprietor exception and are preempted by the PSA.

## III

Seattle advances two reasons why, even if the PSA preempts the City's attempt to regulate the safety and inspection of the Seattle Lateral, we should still require Olympic to comply with the City's safety regulations. First, the City contends that Olympic waived the right to argue that the safety regulations are preempted when it entered into the Franchise Agree-

---

[25]In denying Seattle's motion for relief from the automatic stay, the bankruptcy court reached the same conclusion, concluding that the City used its "police and/or regulatory power" with respect to the Seattle Lateral.

[26]Seattle implies that it limited its actions and arguments to regulatory actions instead of contract enforcement actions and arguments because the City was bound by the bankruptcy court's automatic stay. The City therefore could pursue its contract claims against Olympic without possible sanction from the bankruptcy court only after the district court granted the motion to withdraw the automatic reference to the bankruptcy court. The procedural status of the proceedings in the bankruptcy court does not alter our conclusion that Seattle acted in its capacity as a regulator rather than as a market participant.

ment and the Indemnity Agreement. Second, Seattle asserts that if we do not require Olympic to comply with the City's safety regulations, Olympic and other companies will continue to enter into contracts they know to be unenforceable. We address each argument in turn.

**A**

Seattle argues that at the time Olympic entered into the Franchise Agreement and the Indemnity Agreement, the company believed that the Seattle Lateral was an interstate pipeline, and therefore knew that the PSA preempted Seattle's efforts to impose safety regulations on the pipeline.[27] In spite of this understanding, Olympic chose to enter into the agreements, which include the City's safety regulations. Seattle contends that, by entering into these agreements, Olympic knowingly and voluntarily consented to the City's regulations and waived its right to argue that the regulations are preempted by the PSA.

[8] We reject Seattle's assertion that Olympic "waived" its right to advance a preemption argument. Federal preemption is the allocation of power and decision-making authority between the federal government and the state and local gov-

---

[27]As an initial matter, Olympic argues that the Franchise Agreement expired on December 31, 2000, more than two years before Seattle demanded that Olympic complete the list of thirty-three safety concerns. The Franchise Agreement provides that: "[n]otwithstanding termination or expiration of the permission granted, or closure or removal of the pipeline system," Olympic "shall remain bound by its obligations under this ordinance" until the pipeline is removed. Thus, as long as the pipeline is within Seattle's city limits, Olympic remains bound by its obligations under the Franchise Agreement. The agreement includes, by reference, Olympic's obligations pursuant to the Indemnity Agreement. The Indemnity Agreement states that "the provisions of the Indemnity Agreement shall survive the expiration of the Permit and any renewals or extensions thereof." Olympic has not removed the Seattle Lateral and therefore remains bound by both the Franchise Agreement and the Indemnity Agreement.

ernments, based on the Supremacy Clause of the Constitution. *See Gibbons v. Ogden*, 22 U.S. 1, 211 (1824) (stating that federal supremacy demands that state laws that "interfere with, or are contrary to the laws of Congress . . . must yield"). Preemption is a power of the federal government, not an individual right of a third party that the party can "waive." Olympic could not, therefore, waive a right that it did not possess.

The cases on which Seattle relies are not to the contrary. The City cites cases in which parties to contracts have waived individual constitutional rights or statutory rights. *See*, *e.g.*, *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 186 (1972) (holding that a debtor's waiver of his individual due process rights through the execution of a cognovit note was effective); *Hotel Employees, Rest. Employees Union v. Marriott Corp.*, 961 F.2d 1464, 1468 (9th Cir. 1992) (holding that an employer could waive its right to demand a National Labor Relations Board election); *Erie Telecomms., Inc. v. City of Erie*, 853 F.2d 1084, 1096 (3d Cir. 1988) (holding that a party's waiver of First Amendment, equal protection, and statutory rights by contract was valid); *Legal Aid Soc'y v. City of New York*, 114 F. Supp. 2d 204, 229 (S.D.N.Y. 2000) (holding that the Legal Aid Society's contractual waiver of its right to challenge the City's action, a right provided for by the National Labor Relations Act, was valid). No such right is at issue in this case. Federal preemption is not an individual constitutional right, such as an individual's right to due process, and the PSA does not provide Olympic with a statutory right to challenge Seattle's safety regulations. We therefore reject Seattle's argument that Olympic waived its right to assert preemption.

**B**

Seattle also argues that, by determining that the City's pipeline safety demands are unenforceable, we will encourage Olympic and other pipeline companies to agree in future contracts to safety provisions that the companies do not intend to

honor. To discourage such behavior, the City asserts that we must require Olympic to comply with Seattle's safety regulations for the Seattle Lateral.

We disagree. It is not our function to establish public policy in this area. Rather, Congress has selected the applicable public policy. It has chosen, through the express preemption provision of the PSA, clearly to preclude Seattle from imposing safety regulations on Olympic.

Moreover, it is not apparent that the City's public policy solution is the best one overall. Although a sound public policy might normally discourage companies from entering into contracts that they do not intend to honor, that policy concern is more than balanced by the superordinate federal need to maintain the PSA's policy of providing national uniformity in the establishment and enforcement of hazardous liquid pipeline safety regulations. As the court in *Williams Pipe Line Co. v. City of Mounds View* stated:

> Hazardous liquid pipelines run through 21 states, and presumably through small and large plots of land belonging to vast numbers of persons. Were each of these landowners entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for hazardous liquid pipeline safety would be thwarted.

651 F. Supp. at 569. Accordingly, we do not find the City's public policy argument to be persuasive.

**AFFIRMED.**